**In re McDONALD BROS. CONSTRUC-TION, INC., Debtor.**

**Bankruptcy No. 90 B 884.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

June 11, 1990.

Max Chill, Steven R. Radtke, Chill, Chill & Radtke, P.C., Chicago, Ill., for applicants.

## MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Bankruptcy Judge.

This Chapter 11 case has come before the court on an unusual application, filed by the attorneys for the debtor in possession, seeking "leave to apply" a retainer that they received from the debtor before the case was filed. Because the proper treatment of prepetition retainers is an area of developing law, the court requested briefs on the legal issues raised by the motion, and conducted an informal hearing regarding the circumstances under which the retainer was received. Now, having reviewed the law and the factual submissions made by debtor's counsel, the court concludes that counsel may treat the retainer as their own property without leave of court.

### Factual Background

January 26, 1990, McDonald Bros. Construction, Inc. ("McDonald Bros."), as debtor in possession, presented an application to employ attorneys Max Chill, Steven R. Radtke, and John Loftus. As required by Bankruptcy Rule 2014(a), the application listed the professional services to be rendered and the connections between the attorneys and other entities involved with the case. The application did not set forth any proposed arrangement for compensation, stating simply that the attorneys would be employed "under a general retainer." The court approved this application.

Accompanying the application to employ counsel was a second application—the one now at issue—which disclosed that counsel had received, prior to filing the case, a $12,500 retainer. (Application, ¶ 2.) The application then sets forth what counsel propose to do with the retainer: (1) "apply the said retainer for the time they have spent ... and for further work that will be necessary in the future"; (2) "account to the Court for all time spent in and about the matter"; and (3) in the event the Court allows total fees in an amount less than the retainer, "turn over to the Debtor all such excess." (Application, ¶ 4.)

The brief submitted in support of the retainer application presents a fuller statement of the circumstances under which the retainer was received. According to the brief, there was a meeting on January 13, 1990, between the principal of McDonald Bros. (Kevin A. McDonald), and the attorneys. At the meeting, the brief asserts, the attorneys told McDonald that "if he wanted them to take his Chapter 11 case and devote their time, energies, and experience to the case, McDonald Bros. Construction, Inc. must pay them a retainer of $12,500.00 before they file the case," that "they undoubtedly would apply to the Court in the future for additional compensation," and that "the $12,500.00 was a fee paid for purposes of obtaining their services and getting them involved in the case." (Brief, 2–3.) The brief states that McDonald understood all of this and agreed to pay the retainer as requested. The brief concludes: "When the retainer was paid, it ceased to be the property of McDonald Bros. Construction, Inc. and therefore it is not property of Debtor's estate. The $12,500.00 was earned upon Applicants' receipt

subject to further order to the Bankruptcy Court." (Brief, 6.)

In an informal hearing, conducted on April 16, 1990, counsel confirmed their position that the retainer was an advance payment for services to be rendered in the case.

### Jurisdiction

■■■ This proceeding, dealing with proper treatment of funds received by debtor's counsel, "arises in" the debtor's bankruptcy case, and hence is within the jurisdiction of the district court pursuant to 28 U.S.C. § 1334(b). *See In re Wood*, 825 F.2d 90, 97 (5th Cir.1987) ("'Arising in' proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside the bankruptcy"). Pursuant to 28 U.S.C. § 157(a) and General Rule 2.33(a), the district court has referred all such proceedings to the bankruptcy judges of this district. Because treatment of the retainer affects the administration of the estate, it is a core proceeding, as to which a bankruptcy judge may enter final orders. 28 U.S.C. §§ 157(b)(1), 157(b)(2)(A), (O). *Cf. In re Hudson Shipbuilders, Inc.*, 794 F.2d 1051, 1054–55 (5th Cir.1986); *In re Chas. A. Stevens & Co.*, 109 B.R. 853, 854 (Bankr. N.D.Ill.1990) (each dealing with fee awards).

### Discussion

Although the relief sought by the pending application is stated somewhat subtly, the outcome sought by the debtor's counsel is clear: they want to be able to treat the retainer as their own money—*i.e.*, to spend it—without first obtaining court approval of a fee application. Thus, when the application seeks leave to "apply" the retainer for "work that will be necessary in the

future," the request is for court permission to use the retainer, or such portions of it as they see fit, *before* any review by the court.

A substantial number of recent bankruptcy court decisions have considered the proper treatment of retainers acquired by debtors' counsel before the bankruptcy was filed. In nearly all of these decisions, the bankruptcy judges concluded—contrary to the relief sought by the pending application—that the debtors' lawyers could only use their retainers *after* notice and hearing pursuant to Sections 330 or 331 of the Bankruptcy Code (Title 11, U.S.C., the "Code").[1] However, for the reasons set forth below, these decisions are either inapplicable to the present case or unpersuasive in their analysis of the Code.

1. The fee application procedure of Sections 330 and 331 must be followed whenever compensation is sought from the estate, but not when compensation has been obtained from another source.

Sections 330 and 331 of the Bankruptcy Code allow the court, after notice and hearing, to award compensation for services rendered and reimbursement of expenses to certain professionals, including counsel for the debtor. Section 331 deals with interim awards, and Section 330 deals with final awards. Bankruptcy Rule 2016(a) sets forth the procedure for obtaining such awards, including the requirement of a fee application: a "detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested." Bankruptcy Rule 2002(a)(7) requires 20–day notice of the hearing on all fee applications totalling in excess of $500.

---

1. *In re K & R Mining, Inc.*, 105 B.R. 394, 396 (Bankr.N.D.Ohio 1989); *In re Martin*, 102 B.R. 653, 658 (Bankr.W.D.Tenn.1989); *In re Shah International, Inc.*, 94 B.R. 136, 139 (Bankr.E.D. Wisc.1988); *In re Wyslak*, 94 B.R. 540, 542 (Bankr.N.D.Ill.1988); *In re Burnside Steel Foundary Co.*, 90 B.R. 942, 944 (Bankr.N.D.Ill.1988); *In re C & P Auto Transport, Inc.*, 94 B.R. 682, 683, 690 (Bankr.C.D.Cal.1988); *In re Tri–County Water Association, Inc.*, 91 B.R. 547, 550–51 (Bankr.D.S.D.1988); *In re Structurelite Plastics Corp.*, 91 B.R. 813, 817–18 (Bankr.S.D.Ohio 1988); *In re Chicago Lutheran Hospital Association*, 89 B.R. 719, 734 n. 21 (Bankr.N.D.Ill.1988); and *In re Leff*, 88 B.R. 105, 107 (Bankr.N.D.Tex. 1988), *aff'd sub nom. Stewart v. Law Offices of Dennis Olson*, 93 B.R. 91 (N.D.Tex.1988). Two earlier decisions—*In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 574–75 (Bankr.N.D.Tex.1986), and *In re Kinderhaus Corp.*, 58 B.R. 94, 97 (Bankr.D.Minn.1986)—are often cited in these more recent cases.

This collection of Code sections and rules constitutes the "fee application process." [2]

 Any professional seeking compensation from the estate must comply with the fee application process. Rule 2016(a) so provides: "An entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate *shall* file with the court an application ..." (emphasis added). Moreover, if a professional in possession of estate funds takes the funds as compensation without a court order, that professional would violate the automatic stay. 11 U.S.C. § 362(a)(3) (prohibiting "any act ... to exercise control over property of the estate"). Similarly, a debtor in possession who transferred estate funds to a professional without court order would violate Section 363(b), which requires court approval, after notice and hearing, before estate property is used outside of the ordinary course of the debtor's business (and the employment of bankruptcy professionals would presumably not be in the ordinary course of business).

The rationale for requiring court approval of a profe. ᵓnal's compensation from the estate was set forth in *In re Ross*, 88 B.R. 471, 475 (Bankr.M.D.Ga.), *remanded on other grounds*, 94 B.R. 210 (M.D.Ga. 1988):

> The funds of a bankruptcy estate are trust funds. The Court has a duty to see that these funds are administered in a manner consistent with the intent of the Bankruptcy Code. This duty exists independent of any objections that may be filed by parties in interest. Thus, an attorney for the trustee may only receive payment pursuant to a court order authorizing the trustee to disburse such funds.

 At the same time, the fee application procedure *only* applies when a professional is seeking an award payable from the estate. Nothing in the provisions outlined above authorizes a court to award compensation or reimbursement of expenses from a source other than the estate. To the contrary, an award of compensation under Section 330 is necessarily payable from the estate, since it becomes an administrative expense pursuant to Section 503(b)(2), which is' in turn a priority expense under Section 507(a)(1). Such expenses must either be paid directly from liquidation of the estate, pursuant to Section 726(a)(1), or, indirectly, after the estate vests in the debtor upon confirmation, through a plan that provides for the payment of the expenses in full, pursuant to Section 1129(a)(9), Section 1222(a)(2), or Section 1322(a)(2). Professionals who were fully compensated through non-estate funds would receive duplicate compensation if they obtained an award pursuant to Section 330.[3] Thus, professionals who hold funds that do not belong to the estate need˜ not, and should not, seek an award of those funds through the fee application process.

**2.** Based on the fee application, the court is directed by Section 330(a)(1) to award "reasonable compensation for actual, necessary services rendered ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title." Ordinarily, this award will be the result of a quantum meruit determination: compensation for time spent at an appropriate rate. *See In re Wildman*, 72 B.R. 700, 712 (Bankr.N.D.Ill.1987) (holding that a "lodestar" approach—"multiplying the number of actual and necessary hours *reasonably* expended ·by a reasonable hourly rate"—is "the appropriate method of determining the extent and value of compensation"). However, Section 330 is subject to Section 328(a), which allows a trustee (and hence a debtor in possession) to retain professionals (including attorneys) on any reasonable terms, subject to court approval. Thus, for example, a debtor in possession might retain counsel on a flat fee or contingent fee basis to pursue collection actions, and if the court approves compensation on this basis, the court is required to allow the agreed upon fees, pursuant to Section 330, unless the agreed upon terms and conditions "prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." 11 U.S.C. § 328(a). *In re Confections by Sandra, Inc.*, 83 B.R. 729, 731–32 (9th Cir. BAP 1987).

**3.** Indeed, in order to prevent duplicative compensation, Bankruptcy Rule 2016(a) requires an entity applying for fees from the estate to disclose any "payments [that] have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case [and] the source of the compensation so paid or promised."

2. Counsel for a debtor who is compensated from a source other than the estate must comply with the monitoring procedure of Section 329, but this procedure does not require court approval of a fee application.

■ Most of the professionals retained by a debtor in bankruptcy may receive compensation without court scrutiny as long as they are paid entirely from sources other than the estate. Legal counsel for the debtor, however, must submit all of their compensation, regardless of source, to court scrutiny, pursuant to Section 329 of the Code.[4] The rationale for this requirement is set forth in the legislative history of Section 329:

> Payments to a debtor's attorney provide serious potential for evasion of creditor protection provisions of the bankruptcy laws, and serious potential for overreaching by the debtor's attorney, and should be subject to careful scrutiny.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 329 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 39 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5825, 6285.

■ Section 329(a) addresses this concern by requiring debtors' counsel to file what is, in effect, a disclosure statement, setting forth (1) the compensation that they receive outside of the fee application process and (2) the source of the compensation.[5] The disclosure requirement is broad in its sweep. Section 329(a) applies to all payments as well as agreements to pay compensation, whether made after the case is filed or any time during the year before filing, and it applies regardless of whether the services to be compensated are directly connected with the bankruptcy case or merely in contemplation of the bankruptcy filing. Moreover, this disclosure is required "whether or not such attorney applies for compensation under this title." Thus, even if a debtor's attorney intends to receive no compensation whatever from the estate, Section 329(a) assures that the court and other interested parties will be informed of the source and amount of the attorney's compensation for bankruptcy services.[6]

■ However, the monitoring function of Section 329 does not require the debtor's counsel to provide a statement of time and services, nor does it require court approval before counsel may use the non-estate funds they have been paid. To the contrary, the compensation of debtor's counsel from non-estate funds is unaffected by Section 329 unless the court finds, pursuant to Section 329(b), that "such compensation exceeds the reasonable value of any [bankruptcy-related] services." Only if the compensation is excessive does Section 329(b) authorize the court to cancel an agreement to pay debtor's counsel from non-estate funds or to order the return of funds already paid. This aspect of Section

---

**4.** Section 329 provides the following:

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—

(1) the estate, if the property transferred—
 (A) would have been property of the estate: or

(B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or
(2) the entity that made such payment.

**5.** The section literally requires disclosure of *any* compensation paid to a debtor's attorney for services rendered in connection with the bankruptcy case, but this language cannot reasonably be read to require "disclosure" of compensation that the court has awarded, after notice and hearing, pursuant to Section 330 or Section 331.

**6.** The disclosure requirement of Section 329(a) is effectuated by Rule 2016(b). It provides that the statement required by Section 329 must be filed within 15 days after the order for relief, unless the court otherwise directs, and that a supplemental statement shall be filed within 15 days after any payment or agreement not previously disclosed.

329 is implemented by Rule 2017, which establishes a procedure for the court to determine whether payments to a debtor's counsel are excessive.

3. A prepetition retainer becomes property of the estate upon the filing of a bankruptcy case only if, under applicable state law, the debtor has an interest in the retainer at the time of filing.

■ Given the provisions of Sections 330 and 331 on one hand, and Section 329 on the other, there can be no uniform rule as to whether fee applications are required in order for debtors' counsel to use a prepetition retainer. The fee application process is required if the retainer is property of the estate, and is not required otherwise. *See In re Fulton*, 80 B.R. 1009, 1011 (Bankr.D.Neb.1988) (holding that a fee application under Section 330 or 331 was not required for a flat fee retainer paid in advance of filing a Chapter 12 case, but requiring an application pursuant to Rule 2017, in order to assist the court in determining whether to order a refund of fees pursuant to Section 329(b)).[7]

■ In order for a prepetition retainer held by debtor's counsel to be property of the estate, the debtor must have some interest in the retainer itself at the time the petition is fi ʼ. 11 U.S.C. §§ 541(a)(1) (estate comprised of "all legal or equitable interest of the debtor in property as of the commencement of the case") or 541(a)(2) (community property of the debtor). And whether the debtor has an interest in a prepetition retainer, so as to render that retainer an asset of the estate, is a question of state law. It has long been recognized that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law" and that "state laws are ... suspended only to the extent of actual conflict with the [bankruptcy] system." *Butner v. United States*, 440 U.S. 48, 54, 54 n. 9, 99 S.Ct. 914, 918, 918 n. 9, 59 L.Ed.2d 136 (1979) (applying the Bankruptcy Act). In particular, "[w]hether an agreement creates a lien depends upon state law." *In re Martin Grinding & Machine Works, Inc.*, 793 F.2d 592, 594 (7th Cir.1986).

■ A number of bankruptcy decisions have nevertheless found, without reference to state law, that prepetition retainers are property of the estate. The leading case is *In re Kinderhaus Corp.*, 58 B.R. 94, 97 (Bankr.D.Minn.1986), which states its rule as follows:

A prepetition retainer taken by a debtor's attorney for services to be rendered and costs to be incurred during the pendency of a bankruptcy case is held in trust, except to the extent that attorney's fees are allowed by the Court and ordered paid pursuant to 11 U.S.C. § 330 and § 331, until the case is closed or until the Court orders otherwise. Such a retainer, taken prior to the filing of a petition, becomes property of the estate upon commencement of the case, subject, however, to the terms of the trust. *See* 11 U.S.C. § 541(d).

*Kinderhaus* thus appears to assume that when services are rendered to the debtor during a bankruptcy, the services must be compensated from the estate. But nothing in the Code so provides. Section 541(d), which discusses the treatment under the Code of property in which the debtor holds legal title but no equitable interest, has no application to retainers held by debtors'

---

7. In *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr.N.D.Tex.1986), the court expressed a strong aversion to the use of retainers by debtors' counsel outside of the fee application process:

[T]o allow an attorney for a debtor to draw against a retainer at will and without prior Court approval is a *de facto* emasculation of § 331, which sets forth precise criteria concerning an application for and payment of interim compensation.

However, the provisions of the fee application process, including Section 331, apply only to estate property, and so are not "emasculated" when debtor's counsel use non-estate property without prior court approval. As noted above, compensation of debtor's counsel from non-estate funds is regulated by Section 329, rather than the fee application process.

counsel.[8]

One of the decisions following *Kinderhaus, In re C & P Auto Transport, Inc.*, 94 B.R. 682, 690 (Bankr.E.D.Cal.1988), does offer a rationale for holding that all prepetition retainers are estate property, based on the possibility of a court-ordered return of the retainer, pursuant to Section 329(b):

> [A] putatively nonrefundable or minimum payment is vulnerable to refund or adjustment under various provisions of the Bankruptcy Code, and ... such a device cannot be used to circumvent the requirement of a fee application by professionals who are appointed pursuant to 11 U.S.C. § 327 or the reasonable value inquiry under 11 U.S.C. § 329.... These requirements are so substantial that a retainer received in connection with services to a bankruptcy estate or a debtor in possession must be regarded as property of the estate.

■■■■ This rationale, however, is not persuasive. It is certainly true that the court may order a return of any funds paid to a debtor's counsel, within the scope of Section 329(a), upon a finding that the payment was excessive. However, the possibility of this return does not give the debtor an interest in the transferred funds at the time the case is commenced. It merely gives the estate a potential claim against the transferee. The potential for a return of an excessive prepetition retainer under Section 329 is no different from the potential for recovery of a fraudulent conveyance or preference under Section 550.[9] In all three circumstances, funds transferred prepetition may come into the estate upon the appropriate action being taken in the bankruptcy proceeding. However, until that action is taken, the rights of the parties to the transferred funds are not affected by Code. It is the recovery of the funds involved in an "avoided" transfer, not the potential for recovery, that causes the funds to be considered part of the estate. 11 U.S.C. § 541(a)(3) (defining as property of the estate "[a]ny interest in property that the trustee recovers under section 329(b) ... [or] 550").[10]

■■■■ Thus, the Bankruptcy Code does not render all prepetition retainers held by debtor's counsel property of the estate. It is state law, rather than the Code, that defines the extent of a debtor's interest such a retainer, and hence whether the retainer is property of the estate under Section 541.

4. Whether, under state law, a debtor continues to hold an interest in retainer funds paid to bankruptcy counsel depends on the type of retainer agreement involved.

Before it can be determined whether state law gives clients an interest in retainers that they pay to their attorneys, it is necessary to distinguish three different types of "retainers" that might be involved in a particular attorney-client agreement.

■■■■ a. **"Classic" retainers.** The original understanding of the term "retainer,"

---

8. As discussed infra (at pp. 999–1000), retainers may be held by the attorney in trust for the debtor, but with such retainers, the debtor holds at least an equitable interest in the funds, while the attorney holds, at most, bare legal title. This is the converse of the situation dealt with by Section 541(d).

9. Section 548(a) of the Code, which defines the fraudulent transfers recoverable under Section 550, would itself apply to a retainer for which the debtor did not receive "reasonably equivalent value," as long as there existed one of the conditions of insolvency, insufficient capital, or anticipated inability to pay debts as they matured (which conditions are likely to exist when an entity retains bankruptcy counsel). Similar remedies may be available under state law applicable through Section 544(b).

10. The argument made by *C & P* is flawed in another respect. As noted above, Section 329 allows return of excessive payments made to debtor's counsel, during the year preceding the filing of the case, for services rendered in contemplation of bankruptcy. Thus, if the potential for recovery under Section 329 renders a payment to debtor's counsel property of the estate, then the estate would include funds that the debtor paid to bankruptcy counsel for services *actually rendered* prepetition, and the attorney would not be able to use these funds until the court approved a fee application. Although *C & P* expressly declines to extend its holding to this degree, 94 B.R. at 689 n. 13, its definition of property of the estate would require such a result.

when used to describe payments to a lawyer, had nothing to do with compensation for services. As the California Supreme Court explained in *Baranowski v. State Bar*, 24 Cal.3d 153, 164 n. 4, 593 P.2d 613, 618 n. 4, 154 Cal.Rptr. 752, 757 n. 4 (1979), a "classic 'retainer fee' arrangement" is one in which "a sum of money [is] paid by a client to secure an attorney's availability over a given period of time," so that "the attorney is entitled to the money regardless of whether he actually performs any services for the client." The "classic" definition of "retainer" is also set forth in Black's Law Dictionary 1479 (4th ed. 1968) and 7A C.J.S. *Attorney & Client* § 282 (1980).[11]

Classic retainers have been explained both as payment "to bind the attorney from representing another" and simply as payment "for accepting the case." *Jacobs v. Holston*, 70 Ohio App.2d 55, 58, 434 N.E.2d 738, 741 (1980). Whatever the explanation, however, an essential characteristic of the classic retainer is that it is entirely earned by the attorney upon payment, with the client retaining no interest in the funds.

There appears to be no prohibition of classic retainers under state law. The general rule on negotiated fee arrangements is freedom of contract:

An attorney may make an enforceable contract with one about to become his client for the payment of compensation for services to be rendered. The parties are free, and have an unrestricted right to contract with respect to compensation, and the right should not be curtailed unless there has been an abuse in the procedure. Before an attorney undertakes the business of his client, no confidential relationship exists and the parties deal with each other at arm's length.

7A C.J.S. *Attorney & Client* § 304 (1980) (footnotes omitted). This general rule is reflected in Illinois case law. *Estate of Harnetiaux v. Hartzell*, 91 Ill.App.2d 222, 228, 234 N.E.2d 81, 84 (1968) ("An attorney has the right to contract with respect to his compensation before he undertakes the business of his client"). Moreover, courts have specifically recognized the enforceability of classic retainers. In *Baranowski*, the California Supreme Court stated its opinion that a classic retainer is "earned by the attorney when paid," 24 Cal.3d at 164 n. 4, 593 P.2d at 618 n. 4, 154 Cal.Rptr. at 757 n. 4. In *Jacobs*, the Ohio court found that a $2500 retainer had been paid by the client as "a nonrefundable retaining fee for accepting the case." 70 Ohio App.2d at 59, 434 N.E.2d at 741.

Thus, to the extent that a classic retainer is paid to a bankruptcy attorney prepetition, the attorney need only disclose the payment pursuant to Section 329 of the Code.[12] Because the debtor holds no inter-

**11.** Some authorities use the term "general" or "true" to describe this sort of retainer. *See* Brickman, *The Advance Fee Payment Dilemma: Should Payments Be Deposited to the Client Trust Account or to the General Office Account?*, 10 Cardozo L.Rev. 647, 649 n. 13 (1989) ("A general retainer is a fee for agreeing to make legal services available when needed during a specified time period"); *Jacobson v. Sassower*, 113 Misc.2d 279, 283, 452 N.Y.S.2d 981, 983–84 (N.Y.Civ.Ct.1982), *aff'd*, 122 Misc.2d 863, 474 N.Y.S.2d 167 (N.Y.App. Term 1983), *aff'*. 17 A.D.2d 603, 483 N.Y.S.2d 711, *aff'd*. 66 N.Y.2d 991, 499 N.Y.S.2d 381, 489 N.E.2d 1283 (1985) ("[P]ayment of a preliminary fee may be made solely to receive whatever professional services a client may request during a fixed period. This is called a 'true', or 'general retainer'....") In contrast to such a "general retainer," these authorities use the term "special retainer" to describe an employment relationship and payments for a specific purpose. *Brickman, supra*, at 649 n. 14. However, in *C & P Auto Transport*,

94 B.R. 682, 687 (Bankr.E.D.Cal.1988) the court notes a different use of the term "general retainer" in applications to approve retention of counsel under Section 327 of the Code: "When a bankruptcy court approves employment under a 'general retainer,' it is using that term in the sense that the professional will provide services when requested or required ... and will be paid separately for actual, necessary services rendered at lodestar rates pursuant to section 330 and 331."

**12.** Because Section 329 only applies to payments made "for services rendered or to be rendered," it might be argued that a classic retainer, in that as it does not involve compensation for *services*, need not be disclosed. However, classic retainers are paid to make legal services available, and, in that sense may be considered within the scope of Section 329. The legislative history, in any event, indicates that disclosure is appropriate. See p. 995, supra.

est in a classic retainer, it does not become part of the estate, and no fee application is required before the attorneys use the retainer funds. *Cf. In re C & P Auto Transport, Inc.*, 94 B.R. 682, 687 (Bankr.E.D.Cal. 1988) (recognizing that classic retainers, under state law, are "earned when paid").

 **b. Security retainers.** A second type of retainer agreement between debtors and their attorneys provides that the retainer will be held by the attorneys to secure payment of fees for future services that the attorneys are expected to render. Under such a "security retainer," the money given to the debtors' attorneys is not present payment for the future services. Rather, the retainer remains the property of the debtor until the attorney "applies" it to charges for services actually rendered; any unearned funds are turned over by the attorneys. This kind of retainer is recommended in Bernstein, *Collier Bankruptcy Compensation Guide*, ¶ 2.03 at 2–13 (1989):

> [T]he agreement should provide that: (1) the retainer is deemed a trust fund, subject to deposit in the firm's client trust account ...; (2) any interest accrual on the retainer amount are added to the retainer; (3) the firm has the right to apply against the retainer amount all accrued time charges and reimbursable costs on a monthly basis upon the submission to the client of detailed statements of such time charges and reimbursable costs ... and (4) if either the client or the firm notifies the other party in writing of its decision to terminate the agreement, the balance of the retainer amount may be applied to all accrued but unpaid charges ... and any remainder will be returned....

As noted above, the general rule is that state law will enforce contracts between attorneys and their clients regarding compensation, and security retainers present no grounds for nonenforcement. Such a retainer involves the attorney holding the client's money as a pledge—a possessory security interest—and the Uniform Commercial Code (the "UCC") expressly allows for a possessory security interest in money.

Indeed, security agreements governing collateral in the possession of the secured party do not need to be in writing, UCC § 9–203(a), Ill.Ann.Stat. ch. 26, ¶ 9–203(1)(a) (Smith–Hurd 1989), and no financing statement needs to be filed, since such a security interest in money can only be perfected by possession. UCC § 9–305, Ill.Ann.Stat. ch. 26, ¶ 9–305 (Smith–Hurd 1989). *See generally* Clark, *The Law of Secured Transactions under the Uniform Commercial Code* ¶ 7.2 (1980). Thus, the critical feature of a security retainer—that the attorney holds funds belonging to the client—is permitted under state law.

 The UCC also permits a secured party to commingle fungible collateral, as long as the collateral is identifiable. UCC § 9–207(2)(d), Ill.Ann.Stat. ch. 26, ¶ 9–207(2)(d) (Smith–Hurd 1989). *In re Bevill, Bresler & Schulman Asset Management Corp.*, 67 B.R. 557, 588 (D.N.J.), *aff'd*, 805 F.2d 120 (3d Cir.1986). However, under attorney disciplinary rules, a lawyer must segregate client funds. *See* Model Rules of Professional Conduct Rule 1.15(a) (1983) (adopted in Illinois effective August 1, 1990) ("A lawyer shall hold property of clients ... that is in a lawyer's possession in connection with a representation separate from the lawyer's own property"); Model Code of Professional Responsibility DR 9–102(A)(1) (1980) ("All funds of clients paid to a lawyer or law firm ... shall be deposited in one or more identifiable bank accounts ... and no funds belonging to the lawyer or law firm shall be deposited therein except ... [f]unds belonging in part to a client and in part presently or potentially to the lawyer of law firm ..."). Thus, in *In re Joyce*, 133 Ill.2d 16, 32, 139 Ill.Dec. 720, 728, 549 N.E.2d 232, 240 (1989), the Illinois Supreme Court suspended an attorney's license because, among other things, he failed to segregate client funds received in a settlement.

 The fact that the funds constituting a security retainer continue to be owned by the client dictates the treatment of these retainers under the Bankruptcy Code. One commentator suggests that "[n]othing in the Code or the Rules says

that prior approval of the court must be obtained before [a security] retainer is ... applied." Bernstein, *Collier Bankruptcy Compensation Guide*, ¶ 2.05[4] at 2–24 (1989). To the contrary, because the debtor continues to hold an interest in security retainers, such a retainer is estate property, which can only be used by debtor's counsel upon compliance with the entire fee application process, including court approval.[13] As the court held in *In re Burnside Steel Foundary Co.*, 90 B.R. 942, 945 n. 1 (Bankr.N.D.Ill.1988):

> [I]f the retainer is of the security type ..., ownership of the retainer remains in the debtor even after the petition is filed.... Thus, on the filing of the petition, the security retainer becomes property of the estate under 11 U.S.C. § 541(a)(1).... In such a case, the right to keep the retainer ultimately turns on the filing and approval of a fee application under § 330 of the Code.

**c. Advance payment retainers.** The third type of retainer that a debtor and attorney might agree upon is one in which the debtor pays, in advance, for some or all of the services that the attorney is expected to perform on the debtor's behalf. This type of retainer differs from the security retainer in that ownership of the retainer is intended to pass to the attorney at the time of payment, in exchange for the commitment to provide the legal services. As noted by the New York State Bar Association Committee on Professional Ethics, Opinion 570, 5 (1985), this is the type of agreement that usually exists when advance payments are made in a context other than the provision of legal services.

> Normally, when one pays in advance for services to be rendered or property to be delivered, ownership of the funds passes

upon payment, absent an express agreement that the payment be held in trust or escrow, and notwithstanding the payee's obligation to perform or to refund the payment.

Within the context of legal services, one example of such an advance payment is reflected in *In re Fulton*, 80 B.R. 1009 (Bankr.D.Neb.1988), where the debtor paid his attorney a flat fee of $2000 for all of the work to be performed in a Chapter 12 case. An example of an advance payment retainer intended to cover less than all of the legal services required in a matter may be found in *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 579 (Bankr.N.D. Tex.1986) (setting forth a retainer agreement in which it is stated that the retainer is "fully earned and nonrefundable upon its payment and receipt" and that the client "will be entitled to services to be provided by this firm at the hourly rates specified ... up to the full amount of the retainer"). In the present case, debtor's counsel are asserting that they received an advance payment retainer, covering part of the work to be performed, with an expectation that they would apply for further compensation from the estate when they had performed services sufficient to exhaust the $12,500 retainer.

The enforceability of advance payment retainers under state law is currently unsettled. It has been argued that state-enforced canons of ethics prevent an attorney from accepting an advance payment of fees, *i.e.*, that an attorney must treat all payments by clients with respect to future services as security retainers, held in trust until the services are rendered. The principal argument in this regard is that any payment by a client for legal services should be considered "funds of the client"

---

**13.** Moreover, since a security retainer is paid "for services ... to be rendered ... in connection with the [bankruptcy] case," the debtor's attorneys who have received the retainer must also disclose it pursuant to Section 329(a) of the Code and Bankruptcy Rule 2016(b), and the court may order a refund of the retainer if it is excessive, on its own motion or on the motion of any party, pursuant to Section 329(b) and Bankruptcy Rule 2017. As was the situation with classic retainers, there could also be recov-

ery of an excessive security retainer as a fraudulent conveyance. 11 U.S.C. §§ 544(b), 548, 550. Finally, because the security retainer is property of the estate, a trustee (or, theoretically, even the debtor in possession) could seek a turnover of the retainer pursuant to Section 542 of the Code. *In re Gerwer*, 898 F.2d 730, 734 (9th Cir.1990) (trustee may obtain a turnover of property from a secured creditor in possession of the property prior to default, even in a non-reorganization case).

until the services are rendered. *See* Brickman, *The Advance Fee Payment Dilemma: Should Payments Be Deposited to the Client Trust Account or to the General Office Account?*, 10 Cardozo L.Rev. 647 (1989) (arguing that advance payment retainers are unethical); *but see* N.Y. State Bar Assn.Comm. On Professional Ethics, Opinion 570 (1985) (approving advance fee retainers).[14]

There appears to be no state court decision authoritatively resolving the question. In *Baranowski v. State Bar*, 24 Cal.3d 153, 164, 593 P.2d 613, 618, 154 Cal.Rptr. 752, 757 (1979), the California Supreme Court expressly declined to decide "the question of whether or not an advance fee payment is correctly characterized as money 're-ceived or held for the benefit of clients.' " In *In re Aronson*, 352 N.W.2d 17 (Minn. 1984), the court imposed a penalty on an attorney for failing to treat a retainer as client funds, but only in the context of an agreed order. At present, the issue seems to have been addressed primarily at the level of bar associations ethics committee opinions.[15]

■■ Under Illinois law, though, it appears that advance payment retainers are permitted, for several reasons. First, Illinois recognizes the general rule of freedom of contract with respect to attorney's fees. *Estate of Harnetiaux v. Hartzell*, 91 Ill. App.2d 222, 228, 234 N.E.2d 81, 84 (1968); *see also Sokol v. Mortimer*, 81 Ill.App.2d 55, 63, 225 N.E.2d 496, 500 (1967) (fee arrangements between attorney and client are not presumptively fraudulent). Second, the Illinois State Bar Association has repeatedly approved advance payment retainers in the face of arguments that they violate the rules regarding segregation of client funds. ISBA Opinion No. 703, 11 (1980) ("This Committee is of the opinion that [DR] 9–102(a) does not apply to retainer fees whatever form they may take unless when paid to the lawyer, they are expressly designated in writing to constitute security for fees to be earned"); ISBA Opinion No. 722, 16 (1981) (approving nonrefundable advance payment retainers). Finally, the Illinois courts have repeatedly dealt with challenges to advance payment retainers without suggesting that the acceptance of these retainers was itself improper. *See, e.g., In re Kutner*, 78 Ill.2d 157, 166, 35 Ill.Dec. 674, 677, 399 N.E.2d 963, 966 (1979) (attorney disciplined only because advance payment retainer was excessive); *Simon v. Auler*, 155 Ill.App.3d 1000, 1004–05, 108 Ill.Dec. 525, 526, 508 N.E.2d 1102, 1103, *appeal dismissed*, 116 Ill.2d 576, 113 Ill.Dec. 318, 515 N.E.2d 127 (1987) (partial refund of advance payment retainer ordered, with the court "express[ing] no opinion" whether attorney could have kept the entire retainer "had the retainer contract contained an explicit non-refundability provision.")[16] If it were

---

**14.** The disciplinary rules requiring segregation of client funds present a dilemma for an attorney who receives an advance payment retainer, as noted in the Brickman article:

The requirements codified by DR 9–102 are imposed only if the funds belong at least in part to the client; thus, when an attorney first receives funds, a determination as to their nature and ownership must be made. If the funds are solely the attorney's property, they must be deposited to his general office account; but if they are the client's property, in whole or in part, they must be deposited to the client trust account.

Brickman, 10 Cardozo L.Rev. at 649–50.

**15.** The Brickman article tabulates the bar association ethics opinions as follows:

(a) Holding that all retainers must be treated as client funds: Indiana, Iowa, Massachusetts, Oregon (unless the fee is nonrefundable), San Francisco, South Carolina (except for "general

retainers"), Texas (for services not yet rendered), Virginia, Washington, and Wisconsin. 10 Cardozo L.Rev. at 654 n. 47.

(b) Holding that retainers may be treated as an advance payment of fees, belonging to the attorney when transferred: District of Columbia, Florida, Hawaii, Illinois, Maryland, New York State, Philadelphia. 10 Cardozo L.Rev. at 655 n. 48.

**16.** . These decisions enforce the ethical proscription of excessive legal fees. *See* Model Rules of Professional Conduct Rule 1.5 (1983) ("A lawyer's fee shall be reasonable"); Model Code of Professional Responsibility DR 2–106 (1980) ("A lawyer shall not enter into an agreement for, charge, or collect an illegal or excessive fee"); *see generally* Annotation, *Disciplinary Action— Excessive Legal Fee*, 11 A.L.R.4th 133 (1982). This limitation would apparently apply to all forms of retainers. Thus, in *Jacobs v. Holston*, 70 Ohio App.2d 55, 59, 434 N.E.2d 738, 740

improper to accept any advance payment retainer, the courts would have no reason to consider whether retainers like the ones in *Kutner* and *Simon* were excessive. Advance payment retainers, like the one involved in the present case, should be found enforceable under Illinois law.[17]

 Because the client retains no interest in an advance payment retainer, such a retainer does not become property of the estate and is subject only to disclosure under Section 329 of the Code, rather than to the fee application process of Sections 330 and 331. *In re Fulton*, 80 B.R. 1009, 1011 (Bankr.D.Neb.1988).

5. There is no reason for concluding that the retainer involved in the present case was not an advance payment retainer, which debtor's counsel may use without filing a fee application.

The only question remaining to be determined in this case is whether the retainer received by debtor's counsel was, as they represent, an advance fee retainer. It has been suggested that the "typical" retainer paid to debtor's counsel in a Chapter 11 case is a security retainer. *In re Burnside Steel Foundary Co.*, 90 B.R. 942, 944 (Bankr.N.D.Ill.1988), citing *In re Chicago Lutheran Hospital Association*, 89 B.R. 719, 734 n. 21 (Bankr.N.D.Ill.1988). In *Burnside*, the court found that a retainer paid to Chapter 11 counsel was in fact a security retainer, despite counsel's argument that it was an advance payment. However, the *Burnside* decision itself recognized that a dispute about the terms of any particular retainer agreement can only be resolved as a question of fact. 90 B.R. at 945 (noting the absence of a "carefully drawn" retainer agreement and hence the necessity of "ascertain[ing] the parties' intentions from the circumstances surrounding the payment").

 In the present case, as in *Burnside*, it appears that counsel and the debtor never entered into a written agreement regarding payment of legal fees. This is not good practice; clients, as well as their counsel and the court, should be able to ascertain easily and unambiguously the terms under which they are being represented. However, nothing in state law re-

---

(1980), the Ohio Court of Appeals held that DR 2–106 applied to a classic retainer, allowing the client an opportunity to void the retainer upon a showing that it was "overreaching, unconscionable, unreasonable or unfair." The Illinois courts have held that "a client is permitted to prove that his or her attorney fee is excessive or otherwise unreasonable even though he or she assented to a fixed attorney fee." *In re Marriage of Pitulla*, 141 Ill.App.3d 956, 962, 96 Ill.Dec. 276, 280, 491 N.E.2d 90, 94 (1986) (client entitled to hearing on complaint that excessive fees were contained in a consent order). *Cf. In re Kutner*, 78 Ill.2d 157, 166, 35 Ill.Dec. 674, 677, 399 N.E.2d 963, 966 (1979) (attorney sanctioned for retaining an unreasonable fee for defending client in a simple battery case that was dismissed before trial). Where attorneys have retained a fee that is found to be excessive, the court has awarded judgment against the attorney in the amount of the excessive fee. *Simon v. Auler*, 155 Ill.App.3d 1000, 1005, 108 Ill.Dec. 525, 527–28, 508 N.E.2d 1102, 1104–05, *appeal dismissed*, 116 Ill.2d 576, 113 Ill.Dec. 318, 515 N.E.2d 127 (1987).

17. In other states, the law may be interpreted to require that any client funds received in connection with legal services not yet rendered be placed in a client trust account until earned by performance. In such states, all fee-related retainers are therefore security retainers, which become property of the debtor's estate upon a filing under the Code, and which can only be transferred to the debtor's attorney by way of the fee application process of Sections 330 and 331. At least two of the bankruptcy court decisions indicating that advance fee retainers are property of the estate rely explicitly on state law. *In re Leff*, 88 B.R. 105, 107 (Bankr.N.D. Tex.), *aff'd sub nom. Stewart v. Law Offices of Dennis Olson*, 93 B.R. 91 (N.D.Tex.1988) (citing Texas ethics opinions in holding that "Texas Disciplinary Rule 9–102 requires attorneys to place refundable retainers into trust accounts"); *In re Tri-County Water Association, Inc.*, 91 B.R. 547, 551 (Bankr.D.S.D.1988) (recognizing that state law determines the debtor's interest in property, and citing South Dakota cases and disciplinary rules in holding that all prepetition retainers are to be held in trust). Similarly, in *In re C & P Auto Transport, Inc.*, 94 B.R. 682, 691 n. 17 (Bankr.C.D.Cal.1988), the court, though not basing its holding on this point, "predicted" that advance fee payments retainers would be subject to trust obligations under California law. Because Illinois law does not require advance payment retainers to be held in trust for the client, these decisions are not relevant to the present case.

quires a written agreement in order to effectuate an advance payment retainer. To the contrary, as noted earlier, the Illinois Bar Association has opined that retainers should be treated as advance payments unless there is a written agreement specifying that a security retainer is intended. ISBA Opinion No. 703, 11 (1980). There is, in any event, no extraordinary burden of proof applicable to advance payment retainers.

█ Given their belief that they had been given an advance payment retainer, and in the absence of any facts indicating the contrary, counsel for the debtor in this case had no obligation under the Bankruptcy Code beyond disclosure of their retainer under Section 329. Neither approval of a fee application nor leave of court is required for their use of the retainer. Of course, any interested party may challenge counsel's treatment of the retainer. If the retainer should have been held as client funds, counsel would have violated both the automatic stay and their ethical obligations by using the retainer without a fee application. However, in the absence of any challenge to counsel's treatment and of any facts indicating that this treatment was improper, this court will not itself inquire further into the circumstances surrounding the retainer agreement.[18]

Because counsel's application for "leave to apply" their retainer is therefore unnecessary, and only for that reason, the application will be denied. *Cf. In re Karamitsos*, 88 B.R. 122, 123 (Bankr.S.D.Tex.1988) (denying motion to reopen case as unnecessary for discharge of unscheduled debt).

### CONCLUSION

For the reasons stated above, the application for leave to apply retainer is denied. An appropriate order will be entered.

---

**18.** Similarly, this case appears sufficiently complex that the court itself has not set a hearing, pursuant to Section 329(b), to determine whether the retainer was excessive. However, pursuant to Bankruptcy Rule 2017(a), any party in interest may initiate such a hearing.