**In re Murray F. ARMSTRONG.**

**William S. Meeks, Trustee, Plaintiff,**

v.

**Samuel A. Perroni, The Perroni Law Firm, P.A., Patrick R. James and Patrick R. James, P.A., Defendants.**

**Bankruptcy No. 96–50087S.
Adversary No. 98–5005.**

United States Bankruptcy Court,
E.D. Arkansas,
Pine Bluff Division.

April 26, 1999.

Thomas Streetman, Crossett, AR, for plaintiff.

David Grace, Little Rock, AR, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARY D. SCOTT, Bankruptcy Judge.

THIS CAUSE came before the Court upon the trial of the complaint in an adver-

sary proceeding to recover funds paid to the debtor's criminal defense attorneys. The debtor in this case, Murray Armstrong, is an attorney who organized Ponzi schemes[1] and embezzled massive amounts of funds from his clients to support his snowballing schemes and gambling debts. As is the nature of Ponzi schemes, his financial difficulties were exacerbated rather than remedied. In an effort to support the snowballing debts arising from his schemes, he borrowed money, and in 1994, began gambling in hopes of winning enough money to fund the collapsing Ponzi schemes. Check kiting also became a means of supporting his way of life. In the final days of his financial collapse Armstrong defrauded elderly clients of their life savings. When one of his schemes was finally exposed, they all collapsed. On January 30, 1996, an involuntary bankruptcy petition was filed and an order for relief was entered on March 14, 1996. His bankruptcy discharge has been denied and he is now incarcerated in a state penitentiary for his crimes.

In pursuit of his duties under the Bankruptcy Code, the trustee initiated numerous actions to recover money and property.[2] In this action, the trustee seeks to recover funds paid to attorneys representing Armstrong in various criminal investigations and prosecutions. The trustee's causes of action are based upon theories that the funds are property of the estate, 11 U.S.C. § 542, the transfers constitute fraudulent transfers or preferences, 11 U.S.C. § 548(a)(2), 547(b), or are postpetition transfers, 11 U.S.C. § 549. The

Court granted partial summary judgment in favor of the trustee as against The Perroni Law Firm, P.A. in the amount of $12,641.00, representing the funds held by Perroni[3] in a trust account on the date of the filing of the petition. *Meeks v. Perroni (In re Armstrong)*, 231 B.R. 734 (Bankr.E.D.Ark.1999).[4]

In early 1995, Armstrong was contacted by the Internal Revenue Service and Department of Justice regarding an investigation under the Currency Transaction Reporting Act. On February 15, 1995, Armstrong hired Samuel Perroni to represent him with respect to this investigation. The parties entered into a written agreement pursuant to which Armstrong paid Perroni $10,000 on February 16, 1995, and another $10,000 on February 23, 1995, for a total of $20,000. Perroni kept no records of the time he spent representing Armstrong with regard to this investigation.

Almost a year later, on January 17, 1996, when his nefarious schemes were exposed, Armstrong again contacted Perroni, requesting representation regarding criminal investigations. Although Armstrong and Perroni did not enter into a written agreement, they agreed that Armstrong would remit $30,000 to Perroni. Since Armstrong apparently did not have immediate cash to deliver to Perroni, on January 17, 1996, Armstrong's father gave $15,000 to Perroni. On January 23, 1996, Armstrong endorsed an insurance check in the amount of $42,641 to the Perroni law firm, which check was deposited into the Perroni Law Firm attorney trust account.

---

1. Ponzi schemes are schemes in which returns to investors are financed through funds from new investors rather than through the success of the underlying business venture. *See generally In re Hedged–Investments Assoc.,* 48 F.3d 470 (10th Cir.1995).

2. A total of fifty-seven adversary proceedings have been filed within the context of this bankruptcy case, forty of which were initiated by the trustee. The proceedings to recover money or property include suits against banks with whom Armstrong did business, his Ponzi scheme investors, and gambling casinos.

3. For purposes of this opinion, the Court uses the term Perroni or the firm interchangeably, referring to Samuel Perroni as well as the law firm.

4. Since the trustee obtained judgment for the sums held in the escrow account as of the date of the petition, the Court does not address Count IV of the complaint alleging a cause of action under section 549 governing post-petition transfers.

That same day, a check in the amount of $15,000 was issued from the trust account to the Perroni law firm money market account. Five Thousand Dollars of these funds were paid to Patrick James, an attorney in Perroni's office. The next day, on January 24, 1996, a check in the amount of $15,000 was issued from the trust account to Armstrong's father to reimburse him for the initial deposit to Perroni. Thus, prior to the petition date, Perroni received $57,641, $15,000 of which was returned to Armstrong's father, $30,000 of which was for attorney's fees under some form of retainer agreement, and $12,641 for expenses which remained in Perroni's trust account.

### I. *Turnover of Property of the Estate, 11 U.S.C. § 542*

■ Section 542(a), the basis for the trustee's first cause of action, requires a party holding property of the estate to deliver it to the trustee. Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). While federal bankruptcy law determines the effect of legal or equitable interests in property, *N.S. Garrott & Sons v. Union Planters National Bank (In re N.S. Garrott & Sons)*, 772 F.2d 462, 466 (8th Cir.1985), the Court looks to state law to determine the nature and extent of the interest, *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

■ The trustee asserts that, upon the filing of the involuntary petition on January 30, 1996, all of the funds received by the Perroni law firm became property of the estate and are subject to turnover pursuant to section 542 of the Bankruptcy Code. Perroni asserts that all funds received were in payment of a flat fee, earned and vested in him upon receipt such that the funds are not property of the estate. This argument is based upon Perroni's interpretation of the nature of the

agreement entered into with Armstrong. The nature of the agreement turns on the parties' intent and the precise terms of the agreement, all issues of fact. *See Indian Motocycle Assoc. III Ltd. Partnership v. Massachusetts Housing Fin. Agency,* 66 F.3d 1246 (1st Cir.1995).

■ Case authority recognizes three types of retainer agreements, the classic, security, and advance payment retainers. A classic retainer is paid to secure an attorney's availability and the attorney is entitled to the funds regardless of the services performed. *In re McDonald Bros. Constr., Inc.,* 114 B.R. 989, 998 (Bankr.N.D.Ill.1990). Monies paid to an attorney pursuant to a classic retainer agreement do not become property of the estate. *Id.* at 998–99. Similarly, the advance payment retainer, in which ownership of the retainer is intended to pass to the attorney at the time of the payment in exchange for the commitment to provide legal services, does not become property of the estate *if* it is paid prepetition. *Id.* at 1000.

■ The security retainer, in contrast, permits the attorney to hold a payment from the client to secure payment of fees for future services. Under this agreement, the monies are not a present payment for future services, but remain property of the debtor until the funds are applied to charges for services actually rendered. Thus, funds paid pursuant to a security retainer remain property of the estate. *Id.* at 999–1000. These funds can only be applied by counsel upon compliance with the entire Bankruptcy Code fee application process, including court approval. *Id.* at 1000. *See generally* 11 U.S.C. § 329.[5]

■ The funds received in 1995 under the written retainer agreement were property of Perroni at the time of the filing of

5. The Court does not believe that any of the funds paid to Perroni, prior to the filing of the involuntary petition, were for "services rendered or to be rendered in contemplation of or in connection with the case."

the bankruptcy petition. The written retainer agreement is a classic retainer which was paid to secure Perroni's availability and, under the agreement, he was entitled to the funds regardless of the services performed. *Cf. In re McDonald Bros. Constr., Inc.,* 114 B.R. 989, 998 (Bankr.N.D.Ill.1990). Accordingly, these funds did not become property of the estate when the involuntary petition was filed in January 1996. Even were the agreement merely an advance payment retainer, the funds did not become property of the estate. *Id.* at 1000.

Whether the funds paid to Perroni in January 1996, became property of the estate, presents a more difficult question, however, because there is no written retainer agreement. Perroni's testimony that the funds were his property on the date of delivery is bolstered by the nature of the transactions. Criminal defense attorneys have a unique practice, and, as in many areas of the law, have ethical obligations and responsibilities peculiar to their practice. They are generally not permitted, for example, to utilize contingent fee contracts. *See* ABA Comm. on Professional Ethics, Informal Op. 832 (1965). In addition, they must take into account the limitations of their clients and the nature of the cases. For example, since it is only before trial that their services are valued, they typically seek to be paid in advance of their service. *Id.; see* North Carolina State Bar, Formal Ethics Opinion 4 (1998).[6] It is thus customary in criminal practice to set fees in advance and obtain a substantial retainer. ABA Comm. on Professional Ethics, Informal Op. 832 (1965). A lawyer may charge and collect a set fee to perform specified legal services, regardless of the time required to complete the services so long as the fee is not clearly excessive under the circumstances. *See, e.g.,* North Carolina State Bar, Formal Ethics Opinion 4 (1998). These fee

arrangements are not only permissible, they are typical. The reality in the criminal defense context (given the nature of the proceedings and the oft-times result of the proceedings) is that criminal defense attorneys must obtain a flat fee, up front, which is property of the attorney. These factors, together with Perroni's uncontroverted testimony regarding these fee arrangements, indicate that the parties intended the attorney's fees to be Perroni's property upon receipt of the funds. Accordingly, the $30,000 paid to Perroni relating to the investigations in 1996 were not property of the estate and not subject to turnover under section 542 of the Bankruptcy Code.

## II. *Constructive Fraud: 11 U.S.C. § 548(a)(2)*

Under the constructive fraud provisions of the Bankruptcy Code, 11 U.S.C. § 548(a)(2), the trustee may avoid any transfer of an interest of the debtor in property if the debtor received less than reasonably equivalent value for the transfer and the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer. The trustee's second count alleges that the transfers were not made for reasonably equivalent value such that they may be avoided under the constructive fraud provision of section 548(a)(2).

In determining reasonably equivalent value in this context, the Court looks not only to the hours performed by the attorney, but to the contract as a whole. *See Krommenhoek v. Natural Resources Recovery, Inc. (In re Treasure Valley Opportunities, Inc.),* 166 B.R. 701, 704 (Bankr.D.Idaho 1994). All aspects of the transaction are included in the calculus, not merely tangible hours. *Cf. Christians v. Crystal Evangelical Free Church (In re Young),* 82 F.3d 1407, 1415 (8th Cir.1996), *vacated,* 521 U.S. 1114, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1997), *reinstated,*

6. The Court has not located any Arkansas ethics opinions authority directly addressing these issues.

141 F.3d 854 (8th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 43, 142 L.Ed.2d 34 (1998). Moreover, subsequent appreciation or depreciation in the value does not transform a contract with reasonably equivalent value into a fraudulent transfer. For example, although a party's acts or subsequent events may diminish the value in an exchange, reasonably equivalent value does not change since the focus is the actual time of the exchange, not the result. *See Allard v. Flamingo Hilton (In re Chomakos),* 69 F.3d 769 (6th Cir.1995), *cert. denied,* 517 U.S. 1168, 116 S.Ct. 1568, 134 L.Ed.2d 667 (1996).[7]

 Time is only one factor to be considered in determining whether a fee may be excessive. These flat fee arrangements provide both the attorney and client certainty with regard the costs of legal services and are useful when the amount of time required for a particular matter is uncertain. This is particularly relevant in the criminal defense context since matters may be resolved through dismissal, plea or trial. In addition, the subjective factors of securing a particular attorney, that attorney's time, the *importance and/or prominence* enjoyed by the attorney, the importance and/or notoriety of the client, and the mere fact that the client's freedom may be at stake are relevant factors in the calculus of whether a fee is reasonable.[8]

 When Armstrong and Perroni entered into their contract for legal services, Armstrong was not merely seeking an attorney to expend a certain amount of time to equal $30,000. He was seeking to hire Samuel Perroni, an attorney who enjoys a particular reputation, to negotiate with federal authorities and represent him with regard to alleged criminal activities. In January 1997, Armstrong, a prominent lawyer in his community, was in a great deal of trouble. He was cognizant of the magnitude of his crimes and the terms of prison time he was facing. Since there is more to the calculus in determining the value of Perroni's services, *i.e.,* reasonably equivalent value, than mere hours, the fact that neither Perroni nor the trustee can add up Perroni's hours to equal $30,000 does not alone negate reasonably equivalent value. Similarly, the fact that Perroni's work later came to naught, does not diminish the value of those services.[9] At the time of the contracting, and, indeed throughout the process, reasonably equivalent value was given for the services.

 The same analysis holds true for the transfer made in 1995. While that prosecution came to naught, and Perroni was apparently not required to expend many hours in defending an investigation or prosecution, Armstrong was in fact in a great deal of trouble. He was, among other things, operating Ponzi schemes and kiting checks, all of which were subject to exposure upon investigation. Again, he knew the magnitude of his troubles, sought expensive and reputable counsel, with good reason. The Court cannot discount the possibility that it was Perroni's few hours

---

7. In *Allard v. Flamingo Hilton (In re Chomakos),* 69 F.3d 769 (6th Cir.1995), *cert. denied,* 517 U.S. 1168, 116 S.Ct. 1568, 134 L.Ed.2d 667 (1996), the Sixth Circuit Court of Appeals held that reasonably equivalent value exists for a wager when a bet is placed. The Sixth Circuit reasoned that, since gambling is legal, when a bet is placed, legally enforceable contract rights arise. Those contract rights are property; the placing of the bet, therefore, is the transfer of property. At that time no one can know whether the bet will have a successful outcome. Like an investment in a commodities future, the bet has economic value.

8. *See* Aronson, R., Attorney–Client Fee Arrangements: Regulation and Review (Federal Judicial Center 1990).

9. In Armstrong's case, Perroni was hired to attempt to work out an agreement with the federal authorities in hopes of avoiding prosecution by state court authorities. It appeared that Perroni had in fact effected great strides toward this goal. However, when Armstrong disregarded his attorney's advice and was seen in disguise at an Arkansas gambling facility, the public outcry was so great that the state prosecutors were compelled to file their charges. Perroni's efforts were rendered useless by Armstrong's subsequent behavior.

of work that caused the investigation to come to naught. Again, reasonably equivalent value includes more than the tangible hours actually expended. *See In re Treasure Valley Opportunities,* 166 B.R. 701. The test is whether the exchange conferred an economic benefit which was appropriately valued as of the time of the exchange. *See id.* at 706 (quoting *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.),* 6 F.3d 1119, 1126–27 (5th Cir.1993)). The benefits flowing from hiring Perroni constituted reasonably equivalent value for the transfer of funds for the services. Accordingly, the trustee may not set aside the transfers of funds under section 548(a)(2).

### III. *Preference: 11 U.S.C. § 547*

Under section 547 of the Bankruptcy Code, the trustee may avoid a transfer of an interest of the debtor made on an antecedent debt that entitles the creditor to receive more than other unsecured creditors. *See Buckley v. Jeld–Wen, Inc. (In re Interior Wood Products Company),* 986 F.2d 228 (8th Cir.1993). The plaintiff trustee bears the burden of proving the elements of avoidability under section 547(b). *Nordberg v. Arab Banking Corporation (In re Chase & Sanborn Corporation),* 904 F.2d 588, 595 n. 15 (11th Cir.1990). However, the creditor or transferee bears the burden of providing affirmative defenses it raises pursuant to section 547(c). *Nordberg,* 904 F.2d at 595 n. 15. If the transferee is an insider, 11 U.S.C. § 101, the trustee may look to payments made within a year of the filing of the bankruptcy case. There is no evidence before the Court that Perroni was an insider of the debtor such that the payment made in 1995 may not be recovered as a preference. *Cf. Ellenberg v. William Goldberg & Co. (In re Sullivan Haas Coyle, Inc.),* 208 B.R. 239 (Bankr.N.D.Ga. 1997) (discussion of attorney-insider cases).

With regard to the 1996 payment, the Court does not believe that a preference exists because there is no antecedent debt. The transaction in 1996 was a contract for attorney's services in which the attorney fee was paid contemporaneously with the retention of the attorney. Indeed, Perroni testified that his policy, conveyed to Armstrong, was that "I start to work when I get paid." Thus, under his agreement with Armstrong, Perroni's retention occurred when he received full payment, no earlier than January 23, 1996. Since Armstrong's payment and Perroni's obligation both began on the same day, the payment is not for an antecedent debt. *Cf. In re Investment Bankers, Inc.,* 136 B.R. 1008, 1021 (D.Colo.1989) (client becomes obligated to pay when services are rendered).

Moreover, even if the Court calculates Perronni's obligation from the date Armstrong contacted him, there is no payment on an antecedent debt. On Wednesday, January 17, 1999, Armstrong contacted Perroni regarding representation and gave him his father's check for $15,000. The next Tuesday, the full fee was paid. The retention and full payment were sufficiently contemporaneous such that there is no antecedent debt within the meaning of section 547(b). *See Matter of Anderson–Smith & Assoc.,* 188 B.R. 679 (Bankr. N.D.Ala.1995) (exchange was "functionally simultaneous" despite nine-day delay); *Eide v. United States (In re Quade),* 108 B.R. 681 (Bankr.N.D.Iowa 1989) (time lag of six days). Accordingly, the trustee may not recover the transfers under the theory that they constituted preferences.

### IV. *Conclusion*

When Armstrong paid Perroni fees in the amount of $20,000 and $30,000, in February 1995 and January 1996, under the retainer agreements, those fees became the property of Perroni and thus, when the bankruptcy case was filed, did not become property of the estate. The payments were made in exchange for a contract for legal services and were paid contemporaneously such that there was no payment on an antecedent debt. Therefore no preference payments were made which may be recov-

ered by the trustee. The transfers of funds were not constructively fraudulent under section 548(a)(2) because the transfers were made for reasonably equivalent value in the hire of Perroni's services. Inasmuch as the Court previously rendered summary judgment in favor of the trustee in the amount of $12,641 under Count I,[10] judgment shall be rendered in that amount, together with prejudgment interest, and the remainder of the counts dismissed.

**ORDERED AS FOLLOWS:** Judgment shall be rendered in favor of the trustee in the amount of $12,541 together with prejudgment interest.

**IT IS SO ORDERED.**

**10.** Perroni's argument that he is entitled to setoff, raised belatedly in his brief and not by the pleadings, is unavailing. Perroni is not entitled to setoff under section 553 because the charges for expenses from the trust account were incurred postpetition; section 553 requires that the mutual claims arise before the commencement of the case.