### In re TUNDRA CORPORATION, Debtor.

### Bankruptcy No. 96–16954–JNF.

United States Bankruptcy Court, D. Massachusetts.

Jan. 14, 2000.

---

Jeffrey L. Jonas, Brown, Rudnick, Freed & Gesmer, P.C., Boston, Massachusetts, for Arthur Anderson, LLP.

Charles R. Dougherty, Hill & Barlow, Boston, Massachusetts, for Chapter 7 Trustee.

Joel B. Rosenthal, Shapiro, Israel & Weiner, P.C., Boston, Massachusetts, for Allan M. Shine.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matter before the Court is the Objection of Trustee to Fee Applications of Arthur Andersen LLP and Allan M. Shine, professionals employed by the Debtor prior to the conversion of the case to Chapter

7. The issues raised by the Objection are 1) the amount of reasonable fees that should be awarded to Arthur Andersen LLP ("Arthur Andersen"), accountants and financial advisors to the Chapter 11 Debtor, and Allan Shine, Diane Finkle and the firm of Winograd, Shine & Zacks, P.C. ("WS & Z"), counsel to the Chapter 11 Debtor, (collectively, the "professionals"); and 2) whether the professionals should be compelled to disgorge the prepetition retainers that they received from the Debtor. The Court held a hearing on the Trustee's Objection on November 15, 1999.

## II. PROCEDURAL AND FACTUAL BACKGROUND

The facts necessary to decide the issues are not in dispute. The Debtor filed a voluntary petition under Chapter 11 on September 13, 1996. On the same day, the Debtor filed its Application to Employ Attorney and Affidavit of Proposed Attorneys. In the Application, the Debtor stated that "Applicant desires to employ ALLAN M. SHINE AND DIANE FINKLE under a General Retainer, with services to be charged on an hourly basis at standard and customary rates of WS & Z, as amended from time to time, *subject to review and approval of any compensation to be paid to said Attorneys,* because of the extensive legal services required herein." (emphasis supplied). In the firm's Statement Pursuant to Rule 2016(b), Attorney Finkle disclosed that the Debtor had paid WS & Z a retainer of $16,000 and a cost advance of $2,000 from which the $800 filing fee was paid. The Court granted the Debtor's Application to Employ Attorneys Shine and Finkle and WS & Z on September 17, 1996.

On the date of the filing, the Debtor also filed an Emergency Application to Authorize Use of Cash Collateral, which the Court scheduled for hearing on September 17, 1996. The Debtor attached to the Emergency Application an estimate of net cash generated from operations for the six weeks ending October 31, 1996 which showed a negative ending cash balance. The Debtor's principal lender, Fleet National Bank ("Fleet"), filed an opposition to the Emergency Application on September 16, 1996.[1] In view of the opposition, the Court authorized the use of cash collateral for a limited period through October 3, 1996 when it scheduled a further hearing.

On September 30, 1996, the Debtor moved for an extension of time to file its Schedules and Statement of Financial Affairs. The Court granted the motion, in part, extending the time until October 15, 1996.

On October 2, 1996, Fleet filed a Motion to Appoint a Chapter 11 Trustee. Because the Debtor assented to the Motion, the Court granted the motion on October 3, 1996, and David J. Ferrari was appointed Chapter 11 Trustee. On October 11, 1996, at the Trustee's direction, the Debtor ceased operations. The Chapter 11 Trustee moved to convert the case to Chapter 7 because, as stated by his counsel in his Objection to the Fee Applications of Arthur Andersen LLP and Allan M. Shine, "[i]t became immediately obvious to the

1. In its opposition, Fleet argued that the Debtor was not a viable entity. It stated the following:

Based upon its own projections, it is likely that Tundra will incur substantial administrative expenses which it will be unable to pay. Tundra projects a negative cash flow for the six week projection period. During this six week period, Tundra will have negative cash flow of $131,017.00.
***
Even the most optimistic projections furnished to the Bank by Tundra show mini-mal positive cash flow with no ability to repay Fleet's debt or to make a distribution to unsecured creditors.

Fleet also observed that the Debtor's projected performance was consistent with its pre-Chapter 11 performance; there was no historical basis for its projections which were premised on a collection rate for its accounts receivable of approximately 66%; and Tundra had sustained substantial and accelerated operating losses for its past two fiscal years.

Trustee that reorganization under Chapter 11 would not be feasible."

On October 9, 1996, the Debtor filed an Application to Engage Arthur Andersen as Accountants and Financial Advisors. In the Application, which was signed by Clifford J. Heath, Chief Executive Officer, the Debtor disclosed that it had paid Arthur Andersen a retainer of $45,000 for post-petition services.[2] The Debtor did not disclose any other payments to Arthur Andersen in conjunction with its "preliminary analysis of the Debtor's financial affairs and assistance with the Debtor's preparation of a creditor forebearance proposal." The Debtor also represented that hourly rates for professionals at Arthur Andersen ranged from $85 to $315 per hour, with managers being compensated at rates between $200 and $250 per hour, "seniors" at rates between $125 and $155 per hour, and staff at rates between $85 and $115 per hour. In conjunction with the Application, John M. Ferrara, II, on behalf of Arthur Andersen, submitted an affidavit in which he represented that "[t]he only prior services rendered by Andersen for the Debtor occurred during the last few weeks...." In the affidavit, he did not disclose any payments from the Debtor as a retainer or otherwise.

The Creditors' Committee objected to the Application to Employ Arthur Andersen on grounds that the appointment of a Chapter 11 Trustee obviated the need for Arthur Andersen's services. The Court scheduled a hearing on the Application to Employ Arthur Andersen for October 17, 1996. On October 15, 1996, the Chapter 11 Trustee filed an emergency motion to extend the time with in which to file the Debtor's Schedules and Statement of Financial Affairs. He also filed a motion to convert the Debtor's Chapter 11 case to a case under Chapter 7. The next day, he moved for expedited consideration of the

conversion motion. The Court granted the Chapter 11 Trustee's motion for expedited consideration and scheduled a hearing for October 17, 1996.

At the October 17, 1995 hearing, the Court approved the Debtor's Application to Engage Arthur Andersen, thereby permitting Arthur Andersen's employment from the date of the filing to October 17, 1996. At the same hearing, the Court converted the Debtor's case to a case under Chapter 7. Additionally, on that day, Fleet filed and the Court heard an Emergency Motion for Relief from the Automatic Stay, in which Fleet asserted that the Debtor lacked equity in its collateral and that a reorganization was not in prospect. The Court allowed Fleet's motion on October 17, 1996.

The Trustee filed the Debtor's Schedules and Statement of Financial Affairs on November 8, 1996. In response to question 3 on the Statement of Financial Affairs, regarding payments to creditors in excess of $600 within 90 days immediately prior to the commencement of the case, the Trustee attached a computerized print out showing that Arthur Andersen was paid $10,000 on August 21, 1996 and $35,-000 on September 6, 1996. In response to question 9 regarding payments relating to debt counseling or bankruptcy, the Trustee submitted an attachment showing that Arthur Andersen had been paid $55,000: $10,000 on August 21, 1996 (one check); and $45,000 on September 6, 1996 (three checks).[3]

The Chapter 7 Trustee administered the Chapter 7 case for approximately three years. In August of 1999, he filed his Final Report and Account before Distribution, Request for Compensation and Report on Claims/Proposed Distribution. The Court scheduled a hearing on the

---

2. The only reference to the retainer was the following: "Andersen has been paid a retainer of $45,000."

3. It is unclear whether the Debtor prepared the Statement of Financial Affairs and the Trustee filed it along with the Schedules or whether the Trustee actually prepared and filed the Statement of Financial Affairs.

Final Report and the Chapter 7 Trustee's Objection to the professionals' fee applications for November 15, 1999.

WS & Z seeks compensation for services in the amount of $27,058 for services and reimbursement of expenses in the amount of $1,689.49. Arthur Andersen seeks compensation for services in the amount of $55,757 and reimbursement of expenses in the amount of $637. In its fee application, Arthur Andersen states that the Debtor provided it with "a retainer totaling $45,016." The Trustee objected to the applications on the grounds that the fees requested were neither reasonable nor necessary. He added that because the professional fees incurred in the Debtor's Chapter 11 case are assigned a lower priority under 11 U.S.C. § 726(b) than Chapter 7 administrative claims the retainers paid to WS & Z and Arthur Andersen remain property of the bankruptcy estate and should be disgorged. The Trustee also stated in his Objection that the exact amount of the retainer paid to Arthur Andersen was unclear, observing the following:

> Arthur Andersen states that it received a $45,000 retainer. However, as the attached checks in Exhibit A from the Debtor to Arthur Andersen indicate, it appears that Arthur Andersen received approximately $65,000 from the Debtor, just prior to the filing. On the other hand, Attachment 12 of the Statement of Financial Affairs prepared by the Debtor shows a payment of $55,000 to Arthur Andersen.[4]

In its Response to the Trustee's Objection, Arthur Andersen revealed that the Debtor, in fact, paid it a total of $65,000 prepetition. Based upon the canceled checks and the representations made in the Response, the Court sets forth the following chronology:

8/21/96 Debtor delivered a $10,000 check (#3786) to Arthur Andersen.

8/23/96 Debtor and Arthur Andersen executed a letter agreement pursuant to which the Debtor agreed to pay Arthur Andersen as follows:

> weekly based on weekly invoices which will be payable upon receipt. Tundra Corporation will pay Arthur Andersen $10,000 as a retainer to be held as a deposit to cover the total value of consulting services rendered. Consulting services will be billed for at an hourly rate, based on a 30% discount from standard fees. Hourly rates can range from $100 to $175. The total cost of consulting services is estimated to range between $7,000 and $10,000. Reasonable out of pocket expenses will be billed separately.

9/6/96 Arthur Andersen submitted an invoice to Debtor for services provided for the period August 19, 1996 through September 4, 1996 in the amount of $19,630 plus out of pocket expenses of $354 for a total amount of $19,984. The invoice indicated that John Farrara's services were billed at the discounted rate of $175 per hour. Moreover, the invoice indicated that $19,984 had been applied, leaving a balance due of $-0-as of the date of the invoice.

9/6/96 Debtor paid Arthur Andersen an additional $45,000 via three checks, two in the amount of $10,000 and one in the amount of $25,000. These checks appear to have cleared on September 9, 1996.

9/12/96 Debtor paid Arthur Andersen an additional $10,000. This check appears to have cleared on September 18, 1996.

9/13/96 Debtor filed Chapter 11 petition.

4. See n. 3, supra.

9/19/96 Debtor and Arthur Andersen executed a second letter agreement pursuant to which the parties "acknowledged the receipt of a retainer of $45,000 for the services described herein. The retainer will be held and applied to the last billing invoice or fee application submitted and approved by the Court."

10/3/96 Court appointed Chapter 11 Trustee.

10/9/96 Debtor filed Application to Engage Arthur Andersen.

10/11/96 Chapter 11 Trustee shut down the Debtor's operations.

10/17/96 Court approved Debtor's Application to Engage Arthur Andersen; Court converted case to Chapter 7; Court granted Fleet relief from the automatic stay.

11/8/96 Chapter 7 Trustee filed Schedules and Statement of Financial Affairs.

## III. THE FEE APPLICATIONS

### A. *Arthur Andersen*

Arthur Andersen delineates the following six categories of work for which it seeks $56,758 for services performed between September 6, 1996 and October 4, 1996: 1) preparation of cash flow projections and monitoring of the Debtor's actual performance relative to the projected performance (129 hours/$16,948 in fees); 2) assistance with administrative aspects involved in the filing (18 hours/$1,8700 in fees); 3) review and assessment of the Debtor's operating strategy, and assistance with the formulation of a new strategy to reorganize (87 hours/$13,939 in fees); 4) preparation for and attendance at Court hearings, and the provision of expert testimony (45.75 hours/$8,989 in fees); 5) consulting services related to other bankruptcy matters (e.g. creditor relations, etc.) (44.25 hours/$9,338 in fees); and 6) administrative functions related to the case, including preparation of the fee application (30.75 hours/$4,675 in fees). Thirty-eight percent of the total number of hours expended and 59% of the total amount billed involved managers whose billing rates were $240 per hour and a partner whose billing rate was $300 per hour. Notably the Application made no mention of the $19,984 previously billed and paid with respect to the services performed between August 19, 1996 through September 4, 1996.

A review of Arthur Andersen's Fee Application reveals that a sale of the Debtor's divisions was contemplated prior to the bankruptcy filing.[5] Despite an early awareness of this state of affairs, Arthur Andersen expended 87 hours and seeks reimbursement for services which it values at $13,939 for preparing and presenting an "Orderly Liquidation" strategy to the Debtor and Fleet. The orderly liquidation of the Debtor's assets occurred. It was not conducted by the Debtor, however, but by Fleet, and the net result of the disposition of the Debtor's assets is administrative insolvency.

Although the Debtor was required to seek an extension of time within which to file its Schedules and Statement of Financial Affairs, it did not file them; the Chapter 7 Trustee filed them on November 8, 1996. Nevertheless, Arthur Andersen seeks $1,870 for its services in compiling information and assisting with bankruptcy filing requirements. Moreover, the Sched-

---

5. For example, on September 6, 1996, the following entry appears: "Travel with Tundra executives to Raynham, Rockland and Woburn to meet with divisional heads and employees to brief them on the Company's position and the potential Chapter 11 strategy. 'Road Show' was used to solicit support of Chapter 11 filing." On September 9, 1996, the following entry appears: "Fielded questions from key employees and attended divisional head meeting with Gary Glaser to discuss Chapter 11 process. Facilitated preliminary negotiations/expectations relating to the potential sale of the operating divisions." Fees incurred for these activities total $2,400.

ules and Statement of Financial Affairs that were filed were not complete. For example, the answers to several questions on the Statement of Financial Affairs contained incomplete or inaccurate information.

Arthur Andersen seeks $4,675 for preparing its engagement letters and fee application. The Court observes that Debtor's counsel expended considerably less time and money preparing its fee application, i.e. $792.50. Finally, the Court notes that Arthur Andersen's Application contains numerous instances where specific services are lumped together without time allocated to each of the specific tasks performed.

In its Response to the Trustee's Objection filed on November 8, 1999, Arthur Andersen finally set forth all its transactions with the Debtor. Moreover, it argued that its fees should not be reduced, noting that it had not been paid for prepetition services totaling $17,010.10 and that it should be permitted to apply its retainer to that obligation, which would leave the balance of its retainer ($28,005.90) to satisfy a Chapter 11 administrative claim of $39,543.82. It also argued that its "efforts were a success" and that "the controls put in place with respect to cash flow and liquidity preserved the Debtor's different divisions well enough that today, five of the nine divisions (and all three of those identified by AA as viable in 1996) continue to operate under different ownership." It added that "[w]hile fees may be reduced where a professional has failed, they should be allowed where the professional has succeeded."

### B. Allan Shine, Diane Finkle and WS & Z

WS & Z divided their tasks into six categories: 1) business operations (11

hours/$2,606.50 in fees); 2) case administration (58.8 hours/$12,303 in fees);[6] 3) fee/employment applications (3.9 hours/$792.50 in fees); 4) financing (52.8 hours/$10,117 in fees); 5) meeting of creditors (4.9 hours/$1,029 in fees); and 6) relief from stay proceedings (1 hour/$210 in fees). In the narrative portion of its Application, it observed that it was required to expend an unusual amount of time in administrative matters because the Debtor faced both a severe financial crisis and a management crisis. Indeed, it stated that the Debtor's operations and corporate structure were in "a state of near chaos."[7]

## IV. DISCUSSION

### A. The Fee Applications

The standards for allowance of fees for *actual and necessary services* and reimbursement of expenses are well known to practitioners before this Court, and are set forth not only in numerous decisions in this circuit, *see, e.g., Boston & Maine v. Moore,* 776 F.2d 2 (1st Cir.1985); *In re Smuggler's Beach Properties, Inc.,* 149 B.R. 740 (Bankr.D.Mass.1993); *In re Bank of New England Corp.,* 134 B.R. 450 (Bankr.D.Mass.1991), *aff'd,* 142 B.R. 584 (D.Mass.1992), but in 11 U.S.C. § 330(a)(3)(A) as well. These standards will not be repeated here.

 The Court's review of the fee applications filed by Arthur Andersen and WS & Z lead to different conclusions. The Court finds that the services rendered by counsel to the Debtor provided a benefit to the bankruptcy estate, while those provided by Arthur Andersen, in large measure, did not. Moreover, the failure of Arthur

---

6. Many entries in this category involved brief telephone conversations with creditors and employees.

7. Although the Application suggests that WS & Z advised the Debtor to employ Arthur Andersen as a "turn-around" consultant, a decision with which the Debtor concurred (Application p. 8 first full paragraph), the Court is puzzled by the fact that Arthur Andersen commenced work on August 21, 1996 and WS & Z first billed the Debtor for its services on September 5, 1996.

Andersen to fully disclose the amount of monies it received from the Debtor and its offset of its prepetition debt against its original retainer and its subsequent receipt of additional monies in the purported amount of $45,000 in and of itself warrant reduction of compensation. *See In re Independent Engineering Company, Inc.,* 197 F.3d 13 (1st Cir.1999).

As noted above, the Debtor sought authority to employ Arthur Andersen as accountants and financial advisors without a complete and accurate disclosure of its connections with the Debtor and the existence of a potential preference. *See* Fed. R.Bankr.P.2014(a). The failure to disclose the payment of $19,984 prior to the receipt of the balance of its retainer deprived this Court and the creditors of the bankruptcy estate from making a fully informed decision as to whether Arthur Andersen's engagement should be approved.

As is evident from a review of the fee application, Arthur Andersen's services as a financial consultant were paramount. Moreover, it concluded that the Debtor, as opposed to several of its divisions, was not viable. Despite these conclusions, and the results of its cash flow analysis, which projected operating losses, Arthur Andersen incurred substantial fees. Contrary to its statement that its efforts were a success, this insolvent estate was not benefitted by its services, particularly with respect to its services, valued at approximately $14,000, for developing a strategy for an orderly liquidation in Chapter 11. This is because, based upon its own cash flow analysis, as well as the conclusions of Fleet and the Chapter 11 Trustee, an orderly liquidation was untenable from the outset.[8] As both Fleet and the Trustee immediately recognized, the Debtor did not have the cash to sustain a liquidation under Chapter 11.

■ Similarly, Arthur Andersen expended considerable resources preparing

for court hearings, attending court hearings and attending meetings after court hearings. The result of these efforts for which Arthur Andersen seeks $8,989 provided no significant benefit to the estate, particularly as there was never a likelihood that Arthur Andersen personnel would be called upon to serve as expert witnesses. Additionally, the amount of compensation sought for preparing its fee application and other administrative matters is excessive. In view of these deficiencies, as well as the numerous instances where various services are lumped together without a breakdown of the time expended for each service performed, the Court finds a fee reduction of 50% or $28,197 is compelled.

Counsel to the Debtor, on the other hand, incurred substantially less fees, and performed services consistent with its role as Debtor's counsel. Although in hindsight, the firm should have counseled immediate conversion to Chapter 7, the services it performed were streamlined to prevent unnecessary and duplicative services. Accordingly, the Court does not find it necessary to reduce the fees requested.

## B. *The Retainers*

■ In *In re McDonald Bros. Construction, Inc.,* 114 B.R. 989 (Bankr.N.D.Ill. 1990), the court analyzed various types of retainers, distinguishing those that remain property of the estate from those that are earned on receipt with the debtor retaining no interest in the funds. Observing that bankruptcy courts express a strong aversion to the use of retainers outside the fee application process, 114 B.R. at 996 n. 7, the court stated that "[t]he fee application process is required if the retainer is property of the estate, and is not required otherwise," adding that "whether the debtor has an interest in a prepetition retainer so as to render that retainer an asset of

---

8. It is conceivable that codebtors/guarantors benefitted from the going concern sales of various divisions by Fleet, but the Court lacks

information as to the existence of any codebtors as Schedule G was not completed.

the estate, is a question of state law." 114 B.R. at 996.

There can be little doubt in this case that the retainers paid to WS & Z and Arthur Andersen are property of the estate. Although WS & Z referred to its retainer as a general retainer, it was clearly intended as security for the payment of legal fees after application and court approval. Indeed, in *McDonald Bros.*, the court, while recognizing that classic retainers [9] are sometimes labeled "general" or "true" retainers, also recognized that bankruptcy courts in approving employment under a general retainer use the term " 'in the sense that the professional will provide services when requested or required ... and will be paid separately for actual, necessary services rendered at lodestar rates pursuant to section 330 and 331.' " *Id.* at 998 n. 11 (quoting *In re C & P Auto Transport, Inc.*, 94 B.R. 682, 687 (Bankr.E.D.Cal.1988)).

Based upon the language employed by the Debtor in its application to employ Shine, Finkle and WS & Z, the Court finds that the parties intended that the retainer serve as security for the payment of fees allowed by the Court, and, thus, the retainers remained property of the estate. *See McDonald Bros.*, 114 B.R. at 999 (a "security retainer" is one where "the money given to the debtors' attorneys is not present payment for the future services. Rather, the retainer remains the property of the debtor until the attorney 'applies' it to charges for services actually rendered; any unearned funds are turned over by the attorneys"). The court in *McDonald Bros.* added that "because the debtor continues to hold an interest in security retainers, such a retainer is estate property, which can only be used by debtor's counsel upon compliance with the entire fee application process, including court approval." *Id.* at 1000.

The Court finds that the retainer paid by the Debtor to Arthur Andersen was also a security retainer. In the Debtor's Application to Engage Arthur Andersen the Debtor did not delineate what type of retainer it had paid Arthur Andersen. It merely referenced the payment of a $45,-000 retainer. The letter agreement between Arthur Andersen and the Debtor indicated that the retainer was to be held and applied to the last billing invoice or fee application submitted and approved by the Court. Accordingly, both retainers remained property of the estate until the entry of an order of this Court awarding WS & Z and Arthur Andersen fees pursuant to § 330. *See Indian Motorcycle Associates III L.P. v. Massachusetts Housing Finance Agency*, 66 F.3d 1246, 1255 (1st Cir.1995).

In *Commonwealth of Pennsylvania v. Cunningham & Chernicoff, P.C. (In re Pannebaker Custom Cabinet Corp.)*, 198 B.R. 453 (Bankr.M.D.Pa.1996), the court noted that "prepetition retainers are subject to disgorgement if they are excessive or unreasonable." 198 B.R. at 460 (citing *In re Printing Dimensions, Inc.*, 153 B.R. 715, 720 (Bankr.D.Md.1993)). The court cited as grounds for disgorgement the following: 1) that the retainer is excessive or unnecessary; or 2) that there remains an unused portion. 198 B.R. at 460. The court rejected the proposition that the retainer should be disgorged for the "novel proposition" of achieving parity among administrative claimants. *Id.*

The invoice, which Arthur Andersen submitted to the Debtor, is dated September 6, 1996. It indicated that it had been paid. In its Response to the Trustee's Objection, Arthur Andersen also stated that the $45,000 delivered by the Debtor on September 6, 1996 was "partly to compensate AA for its services to date, and partly as an additional deposit for the re-

---

**9.** Classic retainers are those "in which a 'sum of money [is] paid by a client to secure an attorney's availability over a given period of time,' so that the attorney is entitled to the money regardless of whether he actually performs any services for the client." 114 B.R. at 998.

tainer," and that it reduced its retainer to $35,016 on that date. It then indicated that the retainer was replenished, resulting in a total retainer of $45,016. The Court does not find this accounting for the retainer to be consistent with the facts set forth in the chronology set forth above. In the first place, the Debtor disclosed that it paid Arthur Andersen a retainer of $45,000, not $45,016, when the Debtor sought its engagement. John Ferrara did not correct that statement in his affidavit filed in conjunction with the Debtor's application. Moreover, the clear inference from September 6, 1996 invoice was that it was paid in full prior to September 6, 1996 when the Debtor delivered additional checks to Arthur Andersen totaling $45,000.

■ The Court finds that Arthur Andersen must disgorge its retainer in the total sum of $65,000 for several reasons. In the first place, Arthur Andersen failed to timely disclose all its connections with the Debtor and obfuscated the amount of money it actually received. In short, it failed to disclose that it had received a total of $65,000 prepetition.

To recapitulate, Arthur Andersen received a $10,000 retainer for initial consulting services rendered at reduced rates. As agreed, it then billed the Debtor for services in the amount of $19,984 at reduced hourly rates. The Debtor then paid for those services in part with the initial $10,000 retainer. Arthur Andersen's invoice dated September 6, 1996 indicated that the Debtor paid for those initial services prior to the receipt on September 6, 1996 of the additional $45,000. Accordingly, the Court finds that Arthur Andersen failed to disclose the additional payment on September 12, 1996 of $10,000 and failed to disclose the setoff of the $19,984.[10] The Court concludes that Arthur Andersen drew down $9,984 from the $55,000 that it

received with respect to prepetition services rendered in contemplation of bankruptcy without full and complete disclosure and without Court authority. *See In re Martin,* 817 F.2d 175, 182 (1st Cir.1987) ("[t]here must be at a minimum full and timely disclosure of the details of any given arrangement").

■ The Court also finds that the retainer paid to Arthur Andersen was excessive and Court approval of it on October 17, 1996 was improvident in light of the developments in the case. *See* 11 U.S.C. § 328(a). Finally, the Court has found that many of the services performed by Arthur Andersen were not actual and necessary, and, thus, under any scenario, Arthur Andersen would be compelled to disgorge at least $28,515.50 of the retainer as unearned.

## V. CONCLUSION

In view of the foregoing, the Court orders Arthur Andersen to disgorge the sum of $65,000 and awards Arthur Andersen compensation for fees in the sum of $28,515.50 and for expenses in the sum of $637. The Court awards Allan Shine, Diane Finkle and WS & Z compensation for fees in the sum of $27,058 and for expenses in the sum of $1,684.49.

---

10. The Court notes that had Arthur Andersen disclosed that it had received a retainer in the sum of $45,016 it would have raised a red flag. Such a figure would have elicited inqui- ry by the Court, and probably by counsel to the creditors' committee, as to whether prior payments had been made to it by the Debtor.