**In re ACANDS, INC., Debtor.**

**No. 02–12687(RJN).**

United States Bankruptcy Court, D. Delaware.

Aug. 25, 2003.

Laura Davis Jones, Pachulski, Stang, Ziehl, Young, Jones & Weintraub, P.C., Wilmington, DE, for Debtor.

Frank J. Perch, III, Asst. United States Trustee, Office of the United States Trustee, Wilmington, DE, U.S. Trustee.

Robert J. Dehney, Michael G. Busenkell, Jason W. Harbour, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Barry R. Ostrager, Mary Beth Forshaw, Mark Thompson, Bryce L. Friedman, Simpson Thacher & Bartlett LLP, New York City, for Travelers Casualty and Surety Company.

Kathleen Judith Campbell, Mark T. Hurford, Marla R. Eskin, Campbell & Levine, LLC, Wilmington, DE, Peter Van N. Lockwood, Caplin & Drysdale, Chartered, Washington, DC, for the Official Committee of Asbestos Personal Injury Claimants.

Noel C. Burnham, Natalie D. Ramsey, Jennifer Taylor, Montgomery, McCracken, Walker & Rhoads, LLP, Wilmington, DE, for the Unofficial Committee of Select Asbestos Claimants.

James L. Patton, Edwin J. Harron, Joseph M. Barry, Maribeth Minella, Young, Conaway, Stargatt & Taylor, Wilmington, DE, for the Futures Representative.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW RE: DEBTOR'S MOTION TO EMPLOY THE KENESIS GROUP, LLC

RANDALL J. NEWSOME, Bankruptcy Judge.

### FINDINGS OF FACT

This Chapter 11 case is before the court pursuant to the debtor's motion to employ

The Kenesis Group, LLC ("Kenesis") to assist in processing asbestos personal injury claims pending against the debtor, as well as provide services regarding insurance coverage claims. Travelers Casualty and Surety Co.("Travelers") and the United States Trustee object to this motion on a number of grounds.

The salient facts surrounding this dispute are as follows[1]: From 1958 to 2001, ACandS was an insulation contracting company located in Lancaster, PA. In 1969 the company became a wholly-owned subsidiary of Irex Corporation. Until January 1, 1974, some of the products the company installed contained asbestos. In July of 2001 the company sold its operating assets to another Irex subsidiary, and with the exception of one remaining job, terminated its contracting business. The company presently has about $7 million in assets, one salaried employee (James Hipolet, president and general counsel) and 27 hourly rate employees. Although it maintains its own checking account, most of its other financial operations are handled by Irex.

Beginning in the 1970's, ACandS experienced an onslaught of asbestos personal injury claims. Between 1981 and 2001 it settled some 247,000 such claims. In April of 2002 Travelers, the company's primary insurer, gave notice that it would provide no further insurance coverage for its asbestos claims. This prompted a series of insurance coverage disputes both in federal court and before private arbitrators. The stakes in those coverage disputes are high. Although Travelers' policies (some of which originated with Travelers, and some of which were purchased from Aetna Casualty and Surety Co.) contain a $1 million per occurrence limit, there is no aggregate limit for non-product liability claims. Travelers' potential liability under the policies may exceed $1 billion.

With the bankruptcy filings of many other target asbestos defendants, the pace of asbestos claims accelerated and the size of verdicts substantially increased. As a result, the company pursued a consensual workout of its asbestos liabilities. A settlement was reached with the plaintiffs' asbestos personal injury bar that called for some 273,000 claimants to submit documentation in the form of vital statistics as well as medical reports in support of their claimed medical condition. The workout was hampered by Travelers' refusal to provide insurance coverage, and the company was forced to file this chapter 11 case on September 16, 2002.

As a part of its workout effort, ACandS hired the Washington, D.C. law firm of Gilbert, Heintz and Randolph, LLP ("GHR") to perform a number of tasks, including negotiating a settlement of asbestos-related personal injury claims and preparing a pre-packaged Chapter 11 plan. Paragraph 7 of the December 18, 2001 version of GHR's retention letter states that "ACandS has retained MFR Consulting Services, Inc. ('MFR') to provide additional services in connection with the Pre-Pack Negotiations. MFR's services are independent of GHR's services, and its fees are independent of this fee agreement. ACandS has agreed to pay MFR a flat fee of $250,000 for MFR's Pre-Pack Negotiation-related services." ACandS Exh. 2A, 12/18/01 letter, ¶ 7.

Kenesis came into being on April 5, 2002. GHR holds a 70% interest in the company, and Michael Rooney, the principal of MFR, holds a 10% interest and is a

---

1. A full exposition of the company's history is contained in the affidavit of James Hipolet filed on September 16, 2002 and in the debtor's Second Amended Disclosure Statement (Case No. 02–12687, docket Nos. 2 and 570).

senior partner in the firm. Exh. B, Schedule A to Travelers' Objection. The Chairman of the Board of Kenesis is John Heintz, a partner at GHR. Rooney previously served as President and CEO of the Center for Claims Resolution, an organization founded by defendants in asbestos-related lawsuits to serve as a claims management facility. Approximately 15 years ago he worked for Travelers Indemnity Co., an affiliate of Travelers, and was involved in insurance coverage issues.[2] Kenesis' offices are located on the same premises as GHR.

On May 14, 2002, Kenesis replaced MFR as claims reviewer for ACandS. It's fee for handling an estimated 250,000 claims was set at $3 million, or $12 per claim. The fee was paid biweekly in 6 installments of $500,000 from May 15, 2002 to July 31, 2002. The sum and substance of the agreement between Kenesis and ACandS consists of 1 page, double-spaced. Travelers Exh. 6. On May 17, 2002, by way of an amended retention letter, ACandS confirmed that "it has authorized GHR to retain The Kenesis Group, LLC to perform the services that were being performed by MFR Consulting Services, Inc. ('MFR') in connection with the Pre–Pack Negotiations." (emphasis added). It was agreed that the final installment owed to MFR of $62,500 would be paid to Kenesis "when earned."[3] ACandS Exh. 2A, 5/17/02 letter, ¶ 7.

Although these agreements clearly contemplate that review and evaluation of asbestos personal injury claims would be performed by GHR and Kenesis, unbeknownst to ACandS, the bulk of this work was subcontracted to a third entity called Clearing House, LLC ("Clearing House")[4] . Between May 21, 2002 and August 1, 2002, Kenesis made six payments of $333,333.34 to "J. Benet Wallace d/b/a The Clearing [House]", all without the benefit of a written agreement between the parties. Travelers Exh 9. Apparently J. Benee Wallace is the only principal of Clearing House. She is also a paralegal for Motley Rice LLC (formerly Ness Motley), an asbestos personal injury firm representing plaintiffs. According to Rooney, beginning in January of 2002 Wallace was on leave of absence from Motley Rice. The details of this leave of absence have not been fleshed out. Indeed, no other information has been provided to the court regarding this entity, such as when it was formed, who provided the funding for its formation, who it employed (both as permanent and temporary employees) and what relationship (if any) it had with Motley Rice. Although Kenesis maintained management and oversight of the claims review process, Clearing House was responsible for reviewing the actual documents submitted in support of claims and for processing settlements. According to Rooney, the payment of two-thirds of the $3 million fee to Clearing House accurately reflects the percentage of the work it performed. Tr. 48.

GHR sought approval of its retention by the debtor on September 16, 2002, and the application was finally approved on November 18, 2002. Up until the present motion was filed, Kenesis did not submit a

---

**2.** At the hearing on this motion, ACandS agreed to exclude Kenesis from work on insurance coverage disputes with Travelers.

**3.** What "when earned" means is unclear, since no written agreement between MFR and either GHR or ACandS has been introduced into evidence. In any event, Kenesis has agreed to waive payment of the final installment.

**4.** The parties have referred to this entity as "The Clearinghouse LLC," but "Clearing House, LLC" appears to be the correct name. Travelers Exh. 4.

retention application in this case. Neither Wallace nor Clearing House has ever applied for appointment.

On April 30, 2003, Kenesis agreed to purchase Clearing House from Wallace for $100,000, payable in four installments of $25,000 each. One of those installments has been paid, with the other three coming due September 30, 2003, December 30, 2003 and March 30, 2004. For some unexplained reason, the sale was deemed effective as of February 1, 2003. The purchase agreement lists Wallace's address for notice purposes as 28 Bridgeside Blvd, Mount Pleasant, South Carolina. Travelers Exh. 4. According to Martindale–Hubbell, Motley Rice also resides at that address.

On June 30, 2003 ACandS and Kenesis entered into a retention agreement. In addition to providing consulting services, Kenesis agreed to review and process asbestos claims. A flat rate of $9.50 would be charged "as to any claims where some but inadequate information was provided by the claimant **prior to the petition date**...." (Emphasis added) As to claims where no documentation had been submitted, the charge would be $12.50 per claim. The retention letter further provides that "Kenesis would perform this work directly and/or through its affiliate The Clearinghouse LLC; Kenesis would remain responsible for the quality of such work." Exh. 1 to Debtor's Exh. 1.

On July 2, 2003, the instant motion was filed. Paragraph 9 of the motion states in pertinent part as follows:

> Having provided services to the debtor **prior to the Petition Date,** Kenesis is familiar with the Debtor's business, history and asbestos liabilities. (Emphasis added)

Paragraph 17 also leaves the impression that Kenesis' previous services to the debtor were performed entirely prepetition:

> To the best of the Debtor's knowledge, and except as otherwise disclosed in the Rooney Declaration and the exhibits thereto, ... Kenesis has not been engaged on behalf of the debtor ... **in any matter relating to the Debtor *or its estate.*** (Emphasis added)

The same holds true of paragraph 19:

> Kenesis provided certain services to the debtor **prior to the Petition Date,** for which Kenesis was paid in full prepetition. To the extent that Kenesis had any prepetition claims against the debtor, such claims have been waived. (Emphasis added)

Paragraph 12 of Rooney's declaration reinforces the picture portrayed by the motion:

> Prior to the Petition Date, Kenesis was retained by ACandS as an asbestos claims processing agent with respect to more than 200,000 pending asbestos claims. Kenesis has no unpaid claim for the processing work it performed **prior to the Petition Date.** The amount paid to Kenesis for this processing work was $3,000,000.

Reading the motion and supporting documents as a whole, the only reasonable conclusion to be reached is that all of Kenesis' work was performed prepetition. Unfortunately, the facts are quite to the contrary. According to Rooney, 80% of the work on the 243,000 claims that were processed occurred between the petition date and April 30, 2003. Tr. 81.

### OPINION AND CONCLUSIONS OF LAW

At the close of the hearing on the Kenesis motion, the court invited briefs from the parties on a number of issues.[5] The

---

5. In light of the disposition of the other issues involved, the court need not and will not

first and most important of those issues is whether Kenesis and/or Clearing House were required to obtain court approval before performing any services after the debtor's Chapter 11 petition was filed. Initially, counsel for the debtor argued that no retention application was necessary, because Kenesis had been paid in full prior to the filing of the petition and thus would not seek compensation from the estate.

This assertion is clearly at odds with both the facts and the law. As to the facts, counsel simply cannot have it both ways. On the one hand, at the July 28, 2003 hearing she argued that the debtor was entitled to a credit of $84,000, because Kenesis only processed 243,000 claims. Tr. 5–6; Tr. 63. She then attempted to argue that under the one-page letter agreement with Kenesis, which calls for a fee of $12 per claim, "there would be no duty at all to pay anything back or to give any credit." Tr. 72. Rooney contradicted this latter assertion in the following testimony:

> THE COURT: Mr. Rooney, I'm looking at the May 14 letter. Do you view this $3 million as a retainer? Or do you view that $3 million as being yours from the moment you received it, regardless of what happened after that?
>
> THE WITNESS: Well, I viewed it as being Kenesis' in anticipation of processing the claims as they were submitted, yes.
>
> THE COURT: So, if you didn't have to process 250,000 claims at $12 per claim, the company, it was anticipated, would get something back for that?

address whether Kenesis and/or Clearing House were engaged in the unlawful practice

THE WITNESS: That's correct.

Tr. 81.

Based upon this testimony and the other evidence presented, there is no question that the parties considered the $3 million to be in the nature of an advance payment or security retainer, and accordingly the debtor would be entitled to the unearned portion thereof. The courts have almost uniformly so interpreted such payment arrangements, no matter what labels are attached to them. *See, e.g., In re Tundra Corp.,* 243 B.R. 575, 583 (Bankr.D.Mass.2000)(money transferred to accounting firm by the debtor was in the nature of a security retainer); *In re Gray's Run Technologies, Inc.,* 217 B.R. 48, 56 (Bankr.M.D.Pa.1997)("non–refundable special retainer" is not earned upon receipt since under Pennsylvania Bar rules, any amount not expended must be returned to the client); *In re Bressman,* 214 B.R. 131, 139 (Bankr.N.J.1997)("nonrefundable payment" of $150,000 was an advance payment retainer); *cf.* Delaware Lawyers' Rule of Professional Conduct 1.15(f)(authorizing advance payment retainers but requiring that unearned portion be kept in a trust account and be refundable to the client).

■ Once a Chapter 11 case is filed, the debtor's equitable interest in the unearned portion of the retainer becomes property of the estate under 11 U.S.C. § 541, and the professional may not draw on it absent approval of the court. *In re Prudhomme,* 43 F.3d 1000, 1004 (5th Cir.1995); *In re Downs,* 103 F.3d 472, 478 (6th Cir.1996). By Rooney's estimate, some 80% or $2.4 million of the retainer remained as of the petition date. But after making unauthorized draws on the retainer for postpeti-

of law.

tion work, only $84,000 remained as of April of 2003.

■ Even if Kenesis had been paid a wholly non-refundable fee prepetition, it was still required to file a retention application and obtain court approval as a condition of providing postpetition services to the estate. As is true of § 1103(a), which was the subject of discussion in *In re Arkansas Company, Inc.*, 798 F.2d 645 (3d Cir.1986), § 327(a) unqualifiedly states that the trustee may employ professionals "with the court's approval," regardless of whether payment will be sought out of estate funds. Indeed, the purpose of the rule is deeply embedded in bankruptcy jurisprudence, and overarches fee issues:

> We have previously characterized the requirement of prior approval of employment as a means of ensuring "that the court may know the type of individual who is engaged in the proceeding, their integrity, their experience in connection with work of this type, as well as their competency concerning the same." [citation omitted]
>
> *In re Arkansas Company, Inc.*, 798 F.2d 645, 648 (3d Cir.1986)

■ In her post-hearing brief, counsel for the debtor argues, for the first time, that at least to the extent it was merely processing asbestos claims, Kenesis' employment did not (and apparently does not now) need court approval, because it was not acting as a "professional" under § 327. She cites *In re First Merchants Acceptance Corp.*, 1997 WL 873551 (D.Del.1997), which sets forth a list of factors to consider in determining whether an entity constitutes a professional:

> (1) whether the employee controls, manages, administers, invests, purchases or sells assets that are significant to the debtor's reorganization,

> (2) whether the employee is involved in negotiating the terms of a Plan of Reorganization,

> (3) whether the employment is directly related to the type of work carried out by the debtor or to the routine maintenance of the debtor's operations,

> (4) whether the employee is given discretion or autonomy to exercise his or her professional judgment in some part of the administration of the debtor's estate, i.e. the qualitative approach,

> (5) the extent of the employee's involvement in the administration of the debtor's estate, i.e. the quantitative approach; and

> (6) whether the employee's services involve some degree of special knowledge or skill, such that the employee can be considered a "professional" within the ordinary meaning of the term.

1997 WL 873551 at *2–3.

Applying these factors to the case at hand, the court has no difficulty finding that the services Kenesis has and will provide were and are professional in nature. First, although asbestos claims could hardly be considered assets, their disposition is central to the administration of this estate. While the client has the final say over how those claims will be settled, the debtor's one managerial employee could hardly engage in an independent review of each of the some 273,000 claims in question. Obviously, Kenesis' judgment and analysis has been and will be heavily relied upon.

Second, although Kenesis will not be involved in drafting the Plan, its work could have a dramatic effect upon the two key constituents in the case: Travelers and the asbestos claimants.

Third, the debtor was never in the business of managing asbestos claims, and certainly has no expertise in doing so.

Fourth, even at the Clearing House or The Clearinghouse level, let alone at Kenesis, employees were and will be making crucial judgments about the allowability of asbestos claims. Contrary to counsel's attempts to categorize them as mere paper pushers, these employees are the initial gatekeepers for determining whether a claimant has cancer, the type of cancer involved, the extent of lung impairment, the sufficiency of their proof of exposure to ACandS-installed products and a host of other issues. *See* Exhibits to Supplemental Declaration of Michael F. Rooney. According to the testimony, these so-called clerical employees have already disqualified from any recovery some 25% of those submitting claims, and made an initial determination of how much money another 200,000 might potentially receive. By its own admission, Kenesis itself must rely on this front-line analysis, and is only capable of doing spot audits of their work.

Fifth, this case has only two main issues: insurance coverage and asbestos claims. Kenesis' work will be at the heart of the administration of this case.

Sixth, as has already been indicated, the activities of both Kenesis and its subcontractor require sufficient judgment and skill to qualify as professional in nature. In that regard, it is significant that these exact services previously were provided to ACandS by Gollatz, Griffin & Ewing, P.C., a law firm in Philadelphia, PA. Tr. 80.

Finally, it is ironic that counsel for the debtor would suggest that Kenesis' retention does not need court approval, when on the first day of this case a 21–page application for appointment, along with a declaration of disinterestedness and an extensive retention agreement, were submitted on behalf of Garden City Group Inc., the claims and ballot agent. Case No. 02–12687, Docket No. 4. The services performed by such agents are far less profes-

sional in nature than the services performed by Kenesis, yet court approval for their retention is routinely sought on the first day of large cases.

Unlike the wetlands expert and professional photographer in *In re Ponce Marine Farm, Inc.*, 259 B.R. 484, 494 (D.P.R. 2001), or the expert witnesses used in litigation in *In re Napoleon*, 233 B.R. 910, 913–14 (Bankr.N.J.1999), Kenesis meets all of the criteria of a professional under § 327.

■ Counsel for the debtor next asserts, again for the first time, that if Kenesis is deemed a professional, its employment should be approved *nunc pro tunc* to the petition date. The standard for approving *nunc pro tunc* applications is set forth in *In re Arkansas Co.*, 798 F.2d 645, 648–649 (3d Cir.1986):

> We thus hold that *nunc pro tunc* approval should be limited to cases where extraordinary circumstances are present. Otherwise the bankruptcy court may be overly inclined to grant such approval influenced by claims of hardship due to work already performed.... Such circumstances do not include the mere neglect of the professional who was in a position to file a timely application. When considering an application, the bankruptcy court may grant retroactive approval only if it finds, after a hearing, that it would have granted prior approval, which entails a determination that the applicant satisfied the statutory requirements of 11 U.S.C. §§ 327(a) ... that the applicant be disinterested and that the services performed were necessary under the circumstances.

*See also In re F/S Airlease II, Inc. v. Simon*, 844 F.2d 99, 105–106 (3d Cir.1988), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988).

Although the court has no difficulty finding extraordinary circumstances in this case, they are not the sort contemplated by the Third Circuit's test. Initially, it must be noted that this is not a situation where the applicant should not be held responsible for failing to obtain its appointment. Kenesis shares offices with and is controlled by GHR, a law firm which has extensive experience in bankruptcy cases. The firm should be intimately familiar with the retention requirements imposed by the Bankruptcy Code and Rules. There is no evidence that Kenesis was "under time pressure to begin service without approval", and there has not even been an attempt to justify the nine-month delay in seeking approval.

Of far greater significance are the "other relevant factors." Although the evidence surrounding Kenesis' retention raises more questions than it answers, it is undisputed that when Kenesis finally did file a retention application, it failed to disclose that it had continued to work postpetition; failed to disclose that it had subcontracted two-thirds of the work to, and split its fee with, Clearing House without a written agreement; failed to disclose that the only principal of Clearing House was still employed by one of the law firms whose claims she might be called upon to process; failed to disclose that the debtor was owed a credit of some $2.4 million as of the date of the filing of the petition; failed to disclose that the credit had been whittled down to $84,000 by Kenesis' postpetition charges; and failed to disclose that its "claims processing affiliate" The Clearinghouse, LLC was the reincarnation of Clearing House, which it purchased only two months prior to the date of the application. It took extensive discovery, an evidentiary hearing and close questioning of those involved before these facts were fully revealed. This pattern of conduct suggests willful concealment, not mere negligence. Under these circumstances, Kenesis is a singularly inappropriate candidate for *nunc pro nunc* appointment.

■ Even if Kenesis' application could be approved retroactively, the subcontracting arrangement with Clearing House must be disapproved. As Judge Walrath of this court noted in *In re United Companies Financial Corp.*, 241 B.R. 521, 528 (Bankr.D.Del.1999):

> Parties may not avoid the requirements of section 327(a) by entering into such "subcontracting" arrangements....Such a subcontracting arrangement, if approved would eviscerate the protections of section 327(a) and allow a third party (rather than the debtor or the Court) to determine who should render professional services for the estate.

Obviously, the same principle applies to Kenesis' subcontracting arrangement with its own subsidiary, The Clearinghouse, LLC.

■ These disturbing findings provide more than ample justification for denying Kenesis' application, both retroactively and prospectively. But even absent these findings, the court would be required to deny Kenesis' employment application because of past and future fee-splitting in violation of 11 U.S.C. § 504(a). That section states that:

> ... [A] person receiving compensation or reimbursement under section 503(b)(2) or 503(b)(4) of this title may not share or agree to share—
>
> (1) any such compensation or reimbursement with another person; or
>
> (2) any compensation or reimbursement received by another person under such sections.

Significantly, the statutory prohibition against fee sharing covers not just attor-

neys, but any *person* as that term is defined in 11 U.S.C. § 101(41).

Section 504(b) then sets forth two exceptions, only the first of which is relevant here: a member, partner or regular associate of a professional association, corporation or partnership may share compensation with such persons in the same firm, and the members of that person's firm may share in that compensation. *In re Codesco Inc.*, 15 B.R. 351, 353 (Bankr. S.D.N.Y.1981).

The arrangements that existed between GHR, Kenesis, Clearing House and The Clearinghouse violate § 504(a) in at least three respects. The first violation occurred when Clearing House and Kenesis agreed to share fees, and again when each drew on their respective portions of the prepetition retainer. *In re Matis*, 73 B.R. 228, 233 (Bankr.N.D.N.Y.1987)(prepetition fee-sharing arrangement "was in obvious violation of Code § 504(a)").

■ The second violation would occur when The Clearinghouse, LLC and Kenesis share fees for processing the remaining asbestos claims. Although Kenesis attempts to downplay the separate existence of The Clearinghouse, LLC as "simply an operating subsidiary which is basically a cost center" (Tr. 40), it is a separate entity which requires a separate retention application in order to avoid "any illegal fee sharing in this case." *In re United Companies Financial Corp.*, 241 B.R. 521, 528 (Bankr.D.Del.1999).

■ The third violation, although somewhat more tenuous, would occur through GHR's 70% interest in Kenesis. Nothing has been presented which would prevent GHR from sharing in any profits earned by Kenesis from its work in this case. Given the record before the court, the post-hearing declaration of Craig J. Litherland, a partner in GHR, containing a rather vague waiver of GHR's right to share in those profits is far too little, far too late.

■ Having found violations of both §§ 327(a) and 504(a), and having concluded that the application to employ Kenesis must be denied, the Court must address the United States Trustee's demand that Kenesis be ordered to disgorge the $2.4 million in fees it drew from the debtor's $3 million retainer.

■ Professionals who fail to meet the disclosure requirements of the statute and rules or fail to obtain court approval of their retention are usually required to disgorge fees. *In re Kisseberth*, 273 F.3d 714, 721 (6th Cir.2001); *In re Independent Engineering Co., Inc.*, 197 F.3d 13, 17 (1st Cir.1999); *In re Lewis*, 113 F.3d 1040, 1045 (9th Cir.1997); *In re United Companies Financial Corp.* 241 B.R. 521, 527 (Bankr.Del.1999)(denying fees for work performed prior to filing retention application). Not every violation of the disclosure requirements of the Code and Rules requires disgorgement, but "a bankruptcy court should punish a willful failure to disclose connections under Fed. R. Bankr. P.2014 as severely as an attempt to put forth a fraud on the court." *In re Crivello*, 134 F.3d 831, 836–37 (7th Cir.1998); *see also In re McCrary & Dunlap Const. Co., LLC*, 263 B.R. 574, 588 (M.D.Tenn.2001), *In re United Companies Financial Corp.*, 241 B.R. at 529 ("Denial of compensation is a typical remedy for failure to disclose."). The facts recited above amply justify the conclusion that willful concealment did occur in this case. Accordingly, Kenesis is hereby directed to disgorge $2.4 million to the debtor within 30 days.

## CONCLUSION

The court is not unmindful of the hardship this decision may cause both the debtor and the creditors in this case. But

expediency and convenience must give way to what the law requires, particularly in the sensitive area of employment and compensation of professionals. The willful concealment that occurred here cannot be condoned, regardless of the creditors' desires or interests.

Accordingly, for the reasons stated above, the motion to retain Kenesis Group, LLC is hereby DENIED. Kenesis Group, LLC is hereby directed to disgorge $2.4 million to the debtor within 30 days.

IT IS SO ORDERED.